**FeeDeferred, APLDIST**

# U.S. Bankruptcy Court
## District of Colorado (Denver)
## Adversary Proceeding #: 19−01211−MER

*Assigned to:* Michael E. Romero                          *Date Filed:* 08/07/19
*Lead BK Case:* 19−13565
*Lead BK Title:* Tracy Dean Stephenson
*Lead BK Chapter:* 7
*Demand:*
   *Nature[s] of Suit:*   12  Recovery of money/property − 547 preference
                          14  Recovery of money/property − other
                          11  Recovery of money/property − 542 turnover of property

*Plaintiff*
−−−−−−−−−−−−−−−−−−−−−−−
**M. Stephen Peters**                     represented   **Aaron J. Conrardy**
                                          by 2580 W. Main Street
                                             Suite 200
                                             Littleton, CO 80120
                                             303−296−1999
                                             Fax : 303−296−7600
                                             Email: aconrardy@wgwc−law.com
                                             *LEAD ATTORNEY*

                                             **Lindsay Riley**
                                             Wadsworth Garber Warner Conrardy, P.C.
                                             2580 W Main Street, Suite 200
                                             Suite 200
                                             Littleton, CO 80120
                                             303−296−1999
                                             Email: lriley@wgwc−law.com

V.

*Defendant*
−−−−−−−−−−−−−−−−−−−−−−−
**Jeffrey Mosing**                        represented   **Reagan H. Gibbs**
                                          by Chamberlain Hrdlicka
                                             1200 Smith Street
                                             Ste 14th Floor
                                             Houston, TX 77002
                                             713−658−1818
                                             Email: tres.gibbs@chamberlainlaw.com

                                             **Jarrod Martin**
                                             Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C.
                                             1200 Smith Street
                                             Suite 1400
                                             Houston, TX 77002
                                             713−356−1280
                                             Email: jarrod.martin@chamberlainlaw.com

*Defendant*
————————————————————————
**Mosing Autosport, LLC**     represented  **Reagan H. Gibbs**
*dba* **Mosing Motorcars**         by (See above for address)

                                     **Jarrod Martin**
                                     n
                                     (See above for address)

*Counter–Claimant*
————————————————————————
**Jeffrey Mosing**          represented  **Jarrod Martin**
                           by n
                                (See above for address)

*Counter–Claimant*
————————————————————————
**Mosing Autosport, LLC**     represented  **Jarrod Martin**
                           by n
                                (See above for address)

V.

*Counter–Defendant*
————————————————————————
**M. Stephen Peters**

*Counter–Claimant*
————————————————————————
**Jeffrey Mosing**          represented  **Jarrod Martin**
                           by n
                                (See above for address)

V.

*Counter–Defendant*
————————————————————————
**M. Stephen Peters**

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 08/12/2021 | | 81 | Transcript of ORAL ARGUMENTS ON PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT BEFORE THE HONORABLE MICHAEL E. ROMERO (VIA VIDEOCONFERENCE) UNITED STATES BANKRUPTCY COURT JUDGE. Date Of Hearing: 12/15/2020 before Judge Michael E. Romero. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 11/10/2021. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Requested by Lara Coleman on 8/10/2021. Transcribed and filed by Access Transcripts, LLC. Total cost of Transcript $163.35 (RE: |

| | | | |
|---|---|---|---|
| | | | related document(s) <u>69</u> Minutes of Proceedings/Minute Order). Notice of Intent to Request Redaction Deadline Due By 8/19/2021. Redaction Request Due By 9/2/2021. Redacted Transcript Submission Due By 9/13/2021. Transcript Access Will Be Restricted Through 11/10/2021. (tjv) (Entered: 08/12/2021) |
| 09/10/2021 | | <u>94</u> | Transcript of Evidentiary Hearing. Date Of Hearing: September 3, 2021 before Judge Michael E. Romero. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 12/9/2021. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Requested by Lara A. Coleman on 9/3/2021. Transcribed and filed by Access Transcripts, LLC. Total cost of Transcript $586.85 (RE: related document(s) <u>91</u> Minutes of Proceedings/Minute Order, <u>92</u> Minutes of Proceedings/Minute Order). Notice of Intent to Request Redaction Deadline Due By 9/17/2021. Redaction Request Due By 10/1/2021. Redacted Transcript Submission Due By 10/12/2021. Transcript Access Will Be Restricted Through 12/9/2021. (mmm) (Entered: 09/10/2021) |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

IN RE:                         .    Case No. 19-13565 MER
                               .
TRACY DEAN STEPHENSON,         .    Chapter 7
                               .
            Debtor.            .
                               .
. . . . . . . . . . . . . . .  .

M. STEPHEN PETERS,             .    Adv. No. 19-01211 MER
                               .
            Plaintiff,         .
                               .
    v.                         .
                               .    721 19th Street
JEFFREY MOSING and MOSING      .    Denver, CO 80202
AUTOSPORT, LLC,                .
                               .
            Defendants.        .    Tuesday, December 15, 2020
                               .    1:30 p.m.
. . . . . . . . . . . . . . .  .

TRANSCRIPT OF ORAL ARGUMENTS ON PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE MICHAEL E. ROMERO (VIA VIDEOCONFERENCE)
UNITED STATES BANKRUPTCY COURT JUDGE


ECRO:                     Court Personnel

Transcript Ordered by:    Lara A. Coleman

Date Ordered:             August 10, 2021

Date Delivered:           August 11, 2021

Page Rate/Total Charges: 27 pages at $6.05/page = $163.35


Audio Operator:           Courtroom ECRO Personnel

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

```
TELEPHONIC APPEARANCES:

  For M. Stephen Peters:      Wadsworth Garber Warner Conrardy,
                              P.C.
                              By:  AARON J. CONRARDY, ESQ.
                              2580 W. Main Street, Suite 200
                              Littleton, CO 80120
                              (303) 296-1999

  For Jeffrey Mosing and      McDowell Hetherington LLP
  Mosing Autosport, LLC:      By:  JARROD MARTIN, ESQ.
                              1200 Smith Street, Suite 1400
                              Houston, TX 77002
                              (713) 356-1280
```

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg 6
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page3 of 28

3

```
 1          (Proceedings commence at 1:30 p.m.)

 2          THE COURT:  Good afternoon.  All right.  We're here

 3  in Case Number 19-1211, Peters v. Mosing.  We're here on oral

 4  argument on the parties' cross-motions for summary judgment.

 5  Could I get appearances, please?

 6          MR. CONRARDY:  Good afternoon, Your Honor.  Aaron

 7  Conrardy on behalf of the plaintiff, M. Stephen Peters,

 8  Chapter 7 Trustee.

 9          THE COURT:  Thank you.

10          MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

11  Martin on behalf of the defendants.  I also have with me here

12  today my client and client representative, Jeff Mosing.

13          I also wanted to say hello, Your Honor.  It's been a

14  few years since I appeared in front of you.  I was at the

15  U.S. Trustee's Office probably six or seven years ago.  So it's

16  been a while, but happy to back in your court.

17          THE COURT:  I remember very well, Mr. Martin.

18  Welcome back.

19          MR. MARTIN:  Yeah, we had some fun squatter cases

20  together.

21          THE COURT:  All right.  I don't care -- since these

22  are cross-motions for summary judgment, I don't care who goes

23  first.  The one thing I want both of you to address during the

24  course of your arguments is does it make a difference whether

25  or not this is a sale or a loan.  I know the arguments have
```

4

1  been it really doesn't make a bit of difference, but in looking

2  at it, it very well ma, to various aspects of your arguments.

3  So when you're making your argument, tell me whether it makes a

4  difference.

5        So, just for alphabetical purposes, Mr. Conrardy, why

6  don't you go first.

7        MR. CONRARDY:  Thank you, Your Honor.  As an initial

8  issue, I will address the Court's question regarding whether it

9  makes a difference between a sale or a loan, and I'll kind of

10  address that as I go through my presentation.

11        At the outset, I want to address what I see as a

12  threshold issue, which is whether a constructive trust claim

13  may be avoided under Section 544 of the Bankruptcy Code.

14  Because if the Court rules, as have the Seventh Circuit, Ninth

15  Circuit, Eleventh Circuit, Judge Brown, Judge Brooks, and the

16  U.S. District Court, that a claim of constructive trust is

17  avoidable under Section 544, then that ends the analysis.  I

18  don't think there's any dispute that if there is a constructive

19  trust, it's avoidable under that analysis; and if there's not a

20  constructive trust, as I set forth in the motion for summary

21  judgment, under both Colorado and Texas law, it is clear that a

22  purchase of a motor vehicle without the certificate of title is

23  void.  (Audio interference) --

24        THE COURT:  Isn't a certificate of title just a

25  presumption of ownership that can be challenged?  Or you say

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg 8
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page5 of 28

5

1  that this is an absolute proof of ownership?

2        MR. CONRARDY:  It's absolute proof of ownership under

3  the applicable law when a third party is intervening.  The

4  cases cited by the defendant regarding a presumption of

5  ownership didn't involve third parties such as subsequent

6  purchasers or intervening creditors.

7        The case law that we cited -- and they're even -- one

8  of the cases that the defendant cited was the -- I think it's

9  the Duena (phonetic) case.  It was about the gentleman that

10  sold a car that was titled in New York.  And in New York, GMAC

11  had a lien on it.  And unlike the title practices in Colorado

12  and in Texas, the lien wasn't noted on the title.  It's noted

13  in the records of the Suffolk County Clerk and Recorder's

14  Office.

15        That gentleman sold the car.  The person bought it,

16  and argued that the purchase was free and clear of liens.  The

17  court said no, sorry, you should have called Suffolk County.

18  And if you would have, you would have determined that there was

19  a lien.  So that purchase is subject to the lien.

20        And so, here, if Mr. Mosing had purchased the car --

21  since he didn't get title, the trustee's hypothetical lien

22  would attach just like the fact pattern there, and he's out of

23  luck.

24        So I want -- but I do want to go back to the

25  constructive trust issue.  So I won't go into too much depth

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg 9
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page6 of 28

6

1    about the majority opinions, but I do want to address the

2    <u>Holstein</u> case, which is the Fifth Circuit case, it's kind of

3    the lone court that has held -- lone circuit court, that is,

4    that has held that constructive trusts may be avoidable.  While

5    the facts are very much distinguishable in this case, I want to

6    really just focus on the legal holding and how the Court got to

7    its analysis, and how 541(d) has been amended since then in a

8    material way.

9         So when the <u>Holstein</u> case was decided, 541(d) applied

10   to all property of the estate that became property of the

11   estate under 541(a).  So that would include legal and equitable

12   interest, and it would also include property that the trustee

13   recovers under 541(a)(3).  So when <u>Holstein</u> was decided, that

14   was probably the right conclusion based on 541(d) at the time.

15        However, the year that <u>Holstein</u> was decided, 541(d)

16   was amended to only apply to property of the estate that

17   becomes property of the estate under 541(a)(1) and (a)(2).  So,

18   because of that, 541(d) does not apply to property that the

19   trustee recovers under 544.  And this is the distinction that

20   all -- I think all of outstanding majority courts make; that

21   look, 541(d) was amended, <u>Holstein</u> doesn't apply because of

22   that.  But I'd assert to the Court that if the Fifth Circuit

23   was faced with the identical issue faced in <u>Holstein</u> under what

24   is 541(d) now, it would have ruled the same way that the

25   Seventh Circuit has, the Eleventh Circuit, the Ninth Circuit,

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case: 19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page7 of 28

7

1    Judge Brown, Judge Brooks, and the U.S. District Court.

2            And once you kind of look at that, there's almost no

3    case law to support the defendant's position that a

4    constructive trust isn't avoidable.  They cite to two other

5    cases that are bankruptcy court level cases.  One is the Kane

6    case, and the Kane case is easily distinguishable.  In the Kane

7    case, the bankruptcy court held that the trustee cannot avoid a

8    constructive trust when the debtor never had an interest in the

9    property.  Never.  And that makes sense.  The trustee can't

10    recover property that was never the debtor's property.

11            But here, this is very different because it's

12    undisputed that the debtor purchased the Shelby Cobra, the

13    debtor paid off the $75,000 Extraco lien.  So there's no

14    dispute that the one point this was debtor's property.  It's

15    our position that it was still debtor's property on the

16    petition date.  So Kane --

17            THE COURT:  The payment of the lien was also -- so

18    the lien that was held by the bank was held -- also had real

19    estate attached to it, as well, as security, correct?

20            MR. CONRARDY:  That's correct, Your Honor.

21            THE COURT:  So they could have been -- they could

22    have been paying it off because of the -- that, in and of

23    itself, isn't determinative of the issue, is it?  Because

24    they --

25            MR. CONRARDY:  (Audio interference).

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER   Doc#:81   Filed:08/12/21   Entered:08/12/21 09:03:40   Page8 of 28

8

1          THE COURT:  -- could have been freeing up the real

2    estate, as opposed to the car.

3          MR. CONRARDY:  No, that's correct.  That's not in

4    itself determinative.  But in some of the cases, equity -- or

5    payment of liens against the property is a factor that the

6    courts look at.

7          For instance, in Judge Brooks's <u>Garberding</u> (phonetic)

8    case.  In that case, there was -- the debtor filed bankruptcy.

9    And on the petition date, there was a Mercedes that was titled

10   in her name, but her boyfriend had purchased the Mercedes.  Her

11   boyfriend financed it.  Her boyfriend paid all the insurance.

12   And her boyfriend paid off the lien.  And in that case, Judge

13   Brooks said, well, under certain circumstances, we could avoid

14   the constructive trust claim -- or the trustee could avoid the

15   constructive trust claim.  But here, really, the debtor never

16   really owned it, the debtor never paid down the loan.  It was

17   always the intent of the parties that the boyfriend owned it.

18         But here, none of those factors are present because

19   the debtor purchased the car, the debtor paid off the loan, and

20   it was his -- it was never -- when he initially purchased it,

21   it wasn't his intent that he was buying it for someone else

22   like the debtor -- like the <u>Garberding</u> case.

23         THE COURT:  No, but let's take it to the next step.

24   Isn't the argument that he intended to sell the car to the

25   defendants in this case, and therefore it really wasn't his

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21153Entered:08/12/21 09:03:40    Page9 of 28

9

1  property?  It may not be when he originally purchased it, but

2  subsequently he sold it.  At least that's their argument.

3        MR. CONRARDY:  Well, that's right (audio

4  interference) Your Honor.  So I will address the sale issue,

5  but first I wanted to address a couple of things

6  (indiscernible) we don't think this is a sale.

7        THE COURT:  Okay.  Well, that's -- then we come back

8  to the issue is -- isn't that a factual issue, as to whether

9  this is a sale or a loan, that defeats any motion for summary

10 judgment at this junction?  I mean, isn't that a key issue I've

11 got to determine?

12       MR. CONRARDY:  I -- so there might be enough evidence

13 here for the Court to determine that this was actually a loan,

14 and it's undisputed evidence.  And I'll kind of point to the

15 evidence that we believe is undisputed.

16       So, first of all, the initial check for $120,000 for

17 the loan.  In the memo line, it says one-year capital loan, and

18 that was signed -- that check was signed by Mr. Mosing from

19 Mr. Mosing's personal account.

20       Then, in June of 2019, a Kirk Winterrowd, who's a

21 manager for Mosing Autosport, drafted a letter that Mr. Mosing

22 reviewed and approved, to the trustee; and it said in there

23 that the debtor had borrowed $120,000 and that the collateral

24 was the Cobra.  So that's during the bankruptcy case.  That's

25 two months after the bankruptcy case was filed, the defendant

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:81   Filed:08/12/21   Entered:08/12/21 09:03:40   Page10 of 28

10

1   still representing that this was a loan.

2          Then we have, in June of 2019, the defendant sends --

3   or prepares -- he didn't send it.  He prepared an application

4   to the Texas DMV office to have a title issued to him for the

5   Cobra.  And in it, the reason he states for him being entitled

6   to the title, as Mr. Mosing writes in his handwriting, and he

7   signed it in three different places, that it was for a loan.

8          And then, the last kind of nail in the coffin -- and

9   this kind of mystifies me why they're trying to cast this as a

10  purchase, is Request for Admission Number 3, which we attach to

11  our cross-motion as Exhibit 4, the debtor admits in black and

12  white that the $120,000 was for a loan.  So I just don't know

13  how we get to -- it just seems like they're trying to -- you

14  know, for years and years and years, this was cast as a loan.

15  And then all of a sudden they're trying to recast it as a

16  purchase.

17         THE COURT:  Okay.  Well, let's go back and let me

18  just challenge you a little bit on that.  The agreement that

19  was executed by the debtor indicated that basically he could

20  repurchase the car after a year.  Now, that implied -- doesn't

21  that document imply that it is a sale as opposed to a loan?

22         MR. CONRARDY:  That alone might imply that it's a

23  sale; but if the Court looks at the terms, it's structured more

24  like a loan.  Because 100 and -- let me look at it a moment.

25         THE COURT:  I'm trying to figure out whether this is

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page11 of 28

11

1    really a loan or more like a pawn shop deal, where after a

2    certain period of time, if they don't buy it back, the

3    ownership transfers.  I'm trying to figure out how this is

4    really structured.  I understand the facts that you have --

5    you've indicated, and those are going to be something

6    Mr. Martin's going to have to deal with.  But on your side,

7    there is evidence right now this is a loan.  He didn't pay it

8    within the terms of the loan, so therefore, at least according

9    to some of the documents, it seems to imply that the ownership

10   stays with the defendants.

11         MR. CONRARDY:  Well, it's almost like -- it is kind

12   of -- it's unusual the way they documented it, right?  It's not

13   a typical -- they didn't use lawyers.

14         THE COURT:  That's like a pawn shop, frankly, to me.

15         MR. CONRARDY:  Okay.  And it might be, because it

16   does have -- you know, for instance, if he paid -- if debtor

17   would have paid $130,000 back by 2012, then -- goes up to 140

18   by 2013.  So you can look at those increments of $10,000 every

19   year as almost interest.  But I would assert to the Court that

20   even if it was a purchase, it is still avoidable.

21         THE COURT:  Now do we get to the distinction between

22   a consultant -- a constructive versus a resulting trust then?

23         MR. CONRARDY:  Yes.  And so a couple -- a resulting

24   trust, there's no resulting trust here.  First of all, in the

25   complaint, it specifically -- they specifically used the words

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21153 Entered:08/12/21 09:03:40    Page12 of 28

12

1  "actual fraud," which are kind of magic words for a

2  constructive trust.  A constructive trust is used to remedy

3  fraud.  A resulting trust is not used to remedy fraud.

4        An example of a resulting trust would be grandfather

5  buys a home for his grandson, and the idea is that it's

6  supposed to be a gift for the grandson.  Instead of doing a

7  will, they just agree that when the grandfather dies, the

8  grandson will get the home.

9        Grandfather then files bankruptcy.  Chapter 7 trustee

10  comes in and says hey, this is property of the estate.  The son

11  asserts a resulting trust.  And the difference is a resulting

12  trust is typically a gift, or it's some sort of device to --

13  it's almost like a -- for lack of a better term, like a poor

14  man's will.  Instead of doing a will, someone gifts property.

15        And here we don't have any facts that would support a

16  resulting trust, because the debtor purchased the car.  And in

17  the example that I gave you, the son didn't purchase the house,

18  the grandfather did.  And there was -- we haven't seen any

19  evidence, there is none, that this was supposed to be a gift to

20  Mr. Mosing.

21        So I don't think a resulting trust applies at all.

22  If anything, you know, there's a constructive trust.  And as I

23  say in my motion for summary judgment, I think there's a

24  factual dispute over whether there was actually a constructive

25  trust, because the testimony from Mr. Mosing was that he was

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page13 of 28

13

1  defrauded and that the debtor didn't inform him of a

2  certificate of title.  The testimony from the debtor was that

3  the certificate of title was coming, that he -- that it had

4  been issued and it was on its way.

5         And so who the Court believes is going to come down

6  to a credibility determination, but I would assert as a matter

7  of law the Court doesn't even need to get there if it

8  determines that a constructive trust itself is avoidable.

9         THE COURT:  Are there any exceptions in which a

10  constructive trust can survive even -- even if they are

11  potentially avoidable?  Is it a "void" versus "voidable"?

12         MR. CONRARDY:  Well, that's a really good question,

13  Your Honor.  I haven't seen any exceptions.  I think it's

14  avoidable.

15         THE COURT:  And if it's avoidable, then isn't it an

16  issue of fact as to whether or not there is an exception to the

17  ability to avoid it?

18         MR. CONRARDY:  No.  I think whether there's an

19  exception would be a matter of law, wouldn't it?

20         THE COURT:  Whether it's voidable or void depends on

21  -- that's what I'm trying to figure out.

22         MR. CONRARDY:  Well, if it's -- well, I think whether

23  it's void or voidable would be the same outcome for the

24  trustee.  If it's voidable, the trustee avoids it.  If it's

25  void, it's like it never happened, and so the title is vested

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER   Doc#:81   Filed:08/12/21153  Entered:08/12/21 09:03:40   Page14 of 28

14

1    in the estate.

2            I feel like the Court has another question or maybe I

3    didn't --

4            THE COURT:  No.  Just keep on going.  Trust me, I'll

5    chime in when it's time for me to ask you a question.  I'm not

6    terribly shy about that.

7            MR. CONRARDY:  Okay.  All right.  Thank you, Your

8    Honor.

9            So I think I covered most of the bases, and I'll rest

10   on the briefs.  The bottom line is that the cases -- the

11   majority opinion are very clear that, look, if there is a

12   constructive trust, it's avoidable.  We haven't heard anything

13   here that there is a resulting trust.  I think that's a totally

14   different issue.  We don't have facts to support that.  And

15   because a constructive trust is avoidable, we don't need to

16   have an evidentiary hearing.  Because if we go to trial and the

17   Court says okay, the debtor defrauded Mosing, there's a

18   constructive trust, then it's avoided.  So we didn't need to do

19   that.

20           And if the Court says there's no constructive trust,

21   then Mosing doesn't have an interest in it.  I think under

22   either scenario Mosing probably should be filing an unsecured

23   claim in the case.  That would probably be his remedy here.

24   And so, on that, I'm going to rest on the briefs.  And if the

25   Court has any other questions, I'm happy to answer them.

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page15 of 28

15

1              THE COURT:  Okay.  Thank you.

2              Let me hear from Mr. Martin.

3              MR. MARTIN:  Good afternoon, Your Honor.  Jarrod

4    Martin again for the defendants.  I want to jump right in to

5    the questions that the Court has, which is, is it important

6    whether this is a loan or a sale.

7              First, I think the Court hit the nail on the head

8    when it characterized this agreement as akin to a pawn shop

9    type of transaction.  And I think that's why Mr. Mosing over

10   time has mentally referred to this as a loan.  Because when the

11   initial transaction took place, I think that's how it was

12   characterized.  But there was a specific term in that agreement

13   that required the debtor to pay back the amount of principal by

14   a date certain, and then the understanding was if that didn't

15   occur, then title would -- or ownership would transfer to Mr.

16   Mosing.  And that --

17             THE COURT:  Well, that could come back to bite you,

18   though.  Because in the pawn shop type of transaction, they

19   said there was a certificate of title, which is -- which is

20   turned over or actually written to the pawn shop.

21             MR. MARTIN:  So I understand that --

22             THE COURT:  (Audio interference) particular case, you

23   did not have that, and you did not take any action to convey

24   the original document which was given you into a certificate of

25   title.

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page16 of 28

16

1          MR. MARTIN:  And I think that's because Mr. Mosing

2   was defrauded.  If he had been aware that a Colorado

3   certificate of title was out there with a lien notation on it,

4   I think that would have materially changed the underlying

5   transaction.

6          When you go to Mr. Mosing's deposition --

7   Mr. Mosing's deposition, he testifies -- as a dealer, you need

8   to know if you have a title free and clear; and whether there

9   is a lien notated on that title.  And you have contradictory

10  testimony from the debtor, where the debtor went from believing

11  Mosing understood title was in the process (audio interference)

12  to the debtor believing that Mosing knew title was coming.

13         And I think it's important for the Court to remember

14  that a dispute of fact is genuine when the fact finder

15  heretofore views the evidence and finds in favor of either

16  party.  But I think this material misrepresentation via silence

17  is prima facie evidence that fraud took place.  In a

18  transaction like this, reasonable parties would expect that the

19  existence of a certificate of title with a lien notation would

20  have been disclosed at the time of the transaction.

21         So the next question is why is it important?  Why is

22  it important that Mr. Mosing is claiming an equitable ownership

23  or ownership of this vehicle versus a loan.  And that goes to

24  the case law.  I think the trustee tried to muddle the waters

25  regarding why state title law controls and why that is the --

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:81   Filed:08/12/21   Entered:08/12/21 09:03:40   Page17 of 28

17

1  you know, one of the end-all/be-alls that the Court should stop

2  at.  If the title says this, then that's binding on Mr. Mosing.

3         But that simply doesn't make sense because of

4  situations like this where fraud could be a part of the mix.

5  If I go to buy a vehicle and, you know, I think I'm getting

6  clean title, but there's some trickery that involves someone

7  else getting title to it that I didn't know about, there has to

8  be some sort of mechanism where the fraudulently obtained --

9  and here, it's a fraudulently text certificate of title can be

10 remedied.  And that's one of the purposes of a constructive

11 trust.

12         THE COURT:  But how do you deal with --

13         MR. MARTIN:  (Audio interference).

14         THE COURT:  Mr. Martin, how do you deal with a

15 situation with all the subsequent documentation which

16 Mr. Conrardy referred to, representations were that this was a

17 loan, not a sale.

18         MR. MARTIN:  Well, I think you look at the course of

19 dealings between the parties.  Look at how long this

20 transaction had been in place.  This, quote/unquote,

21 "loan/sale" took place approximately eight years ago.  And this

22 buyback option expired seven years ago, or six years ago.

23         And that takes the case more into the realm of Judge

24 Brooks's Garberding opinion, where over that six-plus-year

25 period of time, the defendant is taking all actions indicating

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:81   Filed:08/12/21   Entered:08/12/21 09:03:40   Page18 of 28

18

1  ownership.  The defendant is in possession of the vehicle.  The

2  defendant is insuring the vehicle.  The defendant is paying for

3  the maintenance of the vehicle.  And the defendant is storing

4  the vehicle in Texas, not in Colorado where the debtor

5  ultimately ends up.

6          And there's no evidence that's been presented that

7  since that time, since that buyback option expired, that the

8  debtor took any action via this fraudulently obtained

9  certificate of title to obtain possession of the vehicle.  That

10 just didn't take place.

11         So I want to first, again, distinguish Judge Brown's

12 In Re Richards case, which the Trustee cites to for the

13 proposition that the strong-arm powers under Section 544 are

14 applicable here.  Judge Brown, in Richards, held that the

15 majority view was the best approach, that the trustee's strong-

16 arm powers under Section 544 take precedence over a party

17 claiming a beneficial interest in property titled  (audio

18 interference) --

19         THE COURT:  That was an equitable lien as opposed to

20 an equitable ownership interest.

21         MR. MARTIN:  Exactly right.  So in Richards the

22 trustee was attempting to avoid an unperfected equitable lien

23 of a creditor.  But in Garberding, which I think is much more

24 analogous to the situation here, the defendant wasn't asserting

25 that he holds an equitable lien (indiscernible) Mercedes.

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21153Entered:08/12/21 09:03:40    Page19 of 28

19

1  Instead, he's asserting an ownership interest, and that is a

2  beneficial ownership and economic interest in a Mercedes, just

3  like Mr. Mosing is doing with the Shelby Cobra.

4          And so the cornerstone analysis that Judge Brooks

5  took up was whether the plaintiff in that case, and here the

6  defendant counter-claimant, would prevail under state law to

7  prove up that equitable ownership and economic interest in the

8  vehicle.

9          And so Judge Brooks then turned to the Colorado

10  statute, which is Subsection (audio interference) certificate

11  of title statute, and the Court notes that a certificate of

12  registration is presumptive evidence of ownership of an

13  automobile, but the presumption is rebuttable.  And then it

14  goes on to state that a certificate of title does not present

15  conclusive proof of ownership.  It's prima facie evidence of

16  ownership, but it's rebuttable; and that's what the defendants

17  are attempting to do here, which is rebut the prima facie

18  evidence of ownership via the significant period of time that

19  has elapsed since Mr. Mosing and Mosing Motor Sport took

20  possession of this vehicle and have engaged in all acts that

21  are consistent with someone owning a vehicle.

22          THE COURT:  Mr. Martin, why didn't your client just

23  simply -- after the period of time had passed, after there was

24  not a repurchase of this vehicle or anything along those lines,

25  why didn't your client either send a letter to the debtor or --

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page20 of 28

20

1    to say basically, okay, it's my -- now you didn't exercise it,

2    so I'm now considering it mine, and then getting certificate of

3    title in Texas, relying on the manufacturer's -- the MOS [sic]?

4            MR. MARTIN:  Well, Your Honor, I don't think there's

5    any --

6            THE COURT:  (Audio interference) took no action to

7    percent themselves.

8            MR. MARTIN:  So I don't think there's any evidence in

9    the record indicating why Mr. Mosing did or didn't make that

10   kind of communication.  But as far as the MSO goes, I think in

11   Mr. Mosing's mind, with that he didn't need a certificate of

12   title.

13           This is a collector's item.  It's a replica Shelby

14   Cobra that goes down in value the more time it's titled in

15   someone's name.  And by having the MSO in any given point in

16   time Mr. Mosing could go down to the Texas Department of Motor

17   Vehicles, show that MSO -- even today, could show that MSO and

18   get a Texas certificate of title based upon that MSO.

19           But in doing that, he would reduce the value of the

20   vehicle, because each time someone is titled on the vehicle --

21           THE COURT:  Can he do that even now that there is

22   obviously a certificate of title issued in Colorado against it?

23           MR. MARTIN:  Well, he could if there weren't a

24   bankruptcy case in place with the title in dispute like it is

25   now.  But if there was no bankruptcy in place, the Texas DMV

21

1  would look at that MSO and give a Texas certificate of title.

2  To have a Colorado certificate of title and a Texas certificate

3  of title, that could -- theoretically, that could happen.  It's

4  not going to happen because of the litigation we're in, but

5  it's plausible and possible.

6       So another similar case, Your Honor, that flows off

7  of the Garberding case is a district court case out of

8  Colorado, the Bernstein v. Sommer case.  And in that case, the

9  District of Colorado concluded that a vehicle was not property

10  of the debtor's estate where the vehicle was purchased in the

11  name of the debtor with funds belonging to someone else, but

12  the debtor never used that vehicle and the debtor never

13  intended to have an interest in that vehicle, which I think,

14  again, analogous to here, because over the eight-year period of

15  time, the debtor's not taking any acts consistent with owning

16  or operating this vehicle.

17       So, Your Honor, I think it's distinguishable from the

18  Judge Brown type of case where it's an equitable lien.  I think

19  the facts show that Mr. Mosing does have title to this -- or

20  not title, but ownership of this vehicle, and has taken acts

21  consistent with ownership of this vehicle, and that's why the

22  Court at the summary judgment stage should rule in favor of my

23  client and declare that there is a constructive trust which

24  defeats the trustee's avoidance powers asserted in the

25  complaint.  Thank you.

22

1          THE COURT:  Mr. Conrardy.

2          MR. CONRARDY:  I have a few -- I'd like to respond to

3   a few of the points that Mr. Martin paid.  First, the <u>Sommer</u>

4   case was a straight turnover case.  There were no issues in

5   there about 544.  So that's not a helpful case.

6          Regarding why Mr. Mosing didn't ask for a certificate

7   of title, I guess that's the allegation, or didn't apply for

8   it, is a little mystifying.  He's a sophisticated, licensed

9   dealer in Texas, and I would think that it would be his normal

10  practice that whenever he's buying or loaning a car that he

11  gets title.  And it would have been a simple phone call to the

12  Colorado DMV or the Texas DMV, since he knew that that's where

13  debtor conducted business, in those states, and he would have

14  quickly discovered, oh, there's been a title issue, and guess

15  what?  There's a lien on it.

16         So -- and we dispute Mr. Martin's characterization

17  that the State of Texas would just issue a certificate of title

18  by presenting an MSO.  I think that would be defrauding the

19  State of Texas.  They know that -- you know, Mr. Mosing knows a

20  certificate of title has been issued in another state?  That --

21  statutes in both Texas and Colorado say that once an MS -- once

22  a certificate of title has been issued, an MSO is a legal

23  nullity.  So I have a hard time -- I would be really concerned

24  that -- I'm concerned that that's their argument, that they

25  could just go anytime and present an MSO to Texas and get a

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
26 of 153
Case:19-01211-MER   Doc#:81   Filed:08/12/21   Entered:08/12/21 09:03:40   Page23 of 28

23

1   title.  I don't really see anything to support that.

2           I'd also argue -- so they keep talking about the

3   ownership interest, and I don't think the fact that it was a

4   purchase or a sale really makes a difference.  There's a Fifth

5   Circuit case that we cite in our response that applies Texas

6   law.  And that is the U.S. v. 1977 Porsche case.  And in that

7   case, a debtor sold his car to his lawyer to pay a retainer.

8   The lawyer didn't get the title.

9           THE COURT:  This is the drug case, right?

10          MR. CONRARDY:  This is the drug case, exactly.  They

11  come in and do a forfeiture, and the Court says, sorry, buddy,

12  you didn't get the title, so you didn't have an interest.  The

13  government's interest trumps yours.  And I don't see how that's

14  any different than what we see here.

15          Mr. Peters is a hypothetical judgment lien creditor.

16  If there was a sale, it's void because there was never a title.

17  And if it's not void, Mr. Peters' interest trumps whatever

18  interest that Mr. Mosing may have in it.

19          THE COURT:  But didn't -- that was a little bit

20  different, because in that case the Fifth Circuit specifically

21  said the original owner never really had possessory interest

22  because it was bought with drug money?

23          MR. CONRARDY:  Well, yes.  That is a difference --

24          THE COURT:  That's a big problem.  There's a big

25  difference.  How does that case really apply here then?

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21153Entered:08/12/21 09:03:40    Page24 of 28

24

1           MR. CONRARDY:  Well, I think that -- that distinction

2    isn't dispositive, because the Texas statute on transferring

3    motor vehicle titles, which I don't have it on my fingertips,

4    but I cited it in the briefs, specifically says that unless

5    until a title is presented to the Texas DMV, a transfer is

6    void.  It says void.

7           And so I just don't know -- what Mr. Martin wants the

8    Court to do is to ignore statutes, and ignore case law, and

9    ignore the Trustee's hypothetical judgment lien powers, and

10   basically take an asset that should be liquidated and the

11   proceeds should be evenly distributed to all the creditors of

12   the case, and he wants to just grab it, preclude any recovery

13   for the estate, as basically his remedy for his mistake of not

14   doing his due diligence, of not getting the title.

15          It's too late.  And if he wants -- you know, he can

16   file a proof of claim, and we reserve any rights to dispute it,

17   but I think that's his real remedy here.  If he was defrauded,

18   that's -- fraud claims are unsecured claims.  And he's trying

19   to elevate his claim in an impermissible way, and we'd ask that

20   the Court grant our motion for summary judgment.

21          THE COURT:  Okay.  Let me just spin back.  One thing

22   that -- again, going back to your original arguments, and I'm

23   just trying -- just in the back of my mind, just want you to

24   help me with.  Under your interpretation or your client's

25   interpretation of 541, can an equitable ownership interest ever

25

1    survive under any circumstance, or are they always to be

2    overridden by a trustee's avoidance power?

3          MR. CONRARDY:  Well, I hate to use absolute terms

4    like "always" or "always" and "absolutely" and "under any

5    circumstance," but I think, at least in this circumstance, that

6    it can be avoided.  If we have facts where it's -- maybe if the

7    facts are like the house example that I gave you where what if

8    Mr. -- what if the debtor purchased this car for Mr. Mosing and

9    never owned it?  Then maybe it's different.  I don't know.  But

10   those aren't the facts before this Court.  I think the facts

11   that we do have before the Court, the Court can rule in the

12   trustee's favor and --

13         THE COURT:  Doesn't that go back to the old avoidable

14   versus, you know, void, argument --

15         MR. CONRARDY:  (Audio interference).

16         THE COURT:  -- that there is -- it's an issue of fact

17   here as to whether or not it falls?  Because that's why I got

18   back to the original question, back even when you first made

19   the argument, is can I do this at a summary judgment position,

20   because is there any set of facts that can prevent the Trustee

21   from exercising his 544 rights over what is potentially

22   ownership -- an equitable ownership interest?

23         MR. CONRARDY:  I can't think of any facts, and both

24   the Colorado and Texas statutes are unequivocal that if you

25   don't have the title, your transaction is void, as to third

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page26 of 28

26

1  parties.  So maybe the one fact, Your Honor, is that if there

2  wasn't a third party intervening lien holder, like a bankruptcy

3  (indiscernible) -- if -- you know, if Mosing were to file the

4  constructive trust lawsuit in Texas and it was resolved

5  prepetition, then he wins, right?  Because there -- at that

6  point you're not -- there's no issue of the third party

7  interest.  And I think that's kind of the -- maybe those are

8  the facts, that there's no third party involved.  But we have a

9  third party here, and it's the Trustee, and his rights and

10  powers under 544.

11          THE COURT:  Okay.  Anything further?

12          MR. CONRARDY:  Nothing further, Your Honor.

13          THE COURT:  All right.  Mr. Martin, you get one final

14  shot.

15          MR. MARTIN:  Thank you, Your Honor.  First, I think,

16  you know, we didn't pay -- give too much strength to the

17  U.S. v. 1977 Porsche case.  I think that's clearly

18  distinguishable in this instance given the findings by the

19  Court relating to the drug part.  So I'm not going to spend too

20  much time on that.

21          I think this all boils down to the estate only has an

22  interest in something to the extent it comes into the estate as

23  an owned interest under 541.  I think the difference here is

24  you have a constructive trust claim which evidences equitable

25  ownership.  It's the Hill v. Koching, the In re Garberding

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:81    Filed:08/12/21    Entered:08/12/21 09:03:40    Page27 of 28

27

1   case, is directly on point, where Judge Brooks said there is an

2   instance in which a party with a beneficial and economic

3   interest in an asset is going to be able to hold onto that.

4   And that's what we're asserting here.

5           So we think that there is sufficient evidence in the

6   record for the Court to rule at this stage.  We don't think

7   that there's any material issues of fact that Mr. Mosing was

8   defrauded, and that there's an identifiable (indiscernible)

9   here in the vehicle, and that the constructive equitable

10  ownership claim is not subject to the Trustee's 544

11  (indiscernible) powers.

12          THE COURT:  All right.  Well, thank you very much,

13  gentlemen.  I want to read through the cases again and go

14  through all of this, and I will let you know.  In case -- I

15  probably will not be speaking to you before the holidays are

16  over, so have a good, safe holiday, all of you.

17          UNIDENTIFIED:  You too, Your Honor.

18          MR. MARTIN:  And Your Honor, just one quick question,

19  sorry to interrupt.  If the Court decides that there are fact

20  issues, will the Court be setting a status conference to set a

21  trial date or --

22          THE COURT:  Yes.

23          MR. MARTIN:  -- how does the Court want to do that?

24          THE COURT:  Yes, we will set up a date so we can talk

25  about trial dates and how long we'll need and everything else.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

28

 1            MR. MARTIN:  Understood.

 2            THE COURT:  So that will be part of the order, if I

 3    decide that's -- that we need to go through with an evidentiary

 4    hearing.  So thank you all.  I really appreciate it.  And have

 5    a good holiday.  And with that, we stand in recess.

 6            MR. MARTIN:  Thank you, Your Honor.  Happy Holidays.

 7            MR. CONRARDY:  Thank you, Your Honor.

 8            THE COURT:  Bye.

 9        (Proceedings concluded at 2:07 p.m.)

10                        *  *  *  *  *

11

12

13                **C E R T I F I C A T I O N**

14

15            I, Alicia Jarrett, court-approved transcriber, hereby

16    certify that the foregoing is a correct transcript from the

17    official electronic sound recording of the proceedings in the

18    above-entitled matter.

19

20

21

22

23    _____

24    ALICIA JARRETT, AAERT NO. 428      DATE: August 11, 2021

25    ACCESS TRANSCRIPTS, LLC


ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

```
IN RE:                         .    Case No. 19-13565 MER
                               .
TRACY DEAN STEPHENSON,         .    Chapter 7
                               .
            Debtor.            .
                               .
. . . . . . . . . . . . . .    .
M. STEPHEN PETERS,             .    Adv. No. 19-01211 MER
Chapter 7 Trustee,             .
                               .
            Plaintiff,         .
                               .
      v.                       .
                               .
JEFFREY MOSING and MOSING      .    721 19th Street
AUTOSPORT, LLC,                .    Denver, CO 80202
                               .
            Defendants.        .
                               .    Friday, September 3, 2021
. . . . . . . . . . . . . .    .    9:31 a.m.
```

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE MICHAEL E. ROMERO (VIA VIDEOCONFERENCE)
UNITED STATES BANKRUPTCY COURT JUDGE

ECRO:                      Court Personnel

Transcript Ordered by:     Lara A. Coleman

Date Ordered:              September 3, 2021

Date Delivered:            September 10, 2021

Page Rate/Total Charges:   121 pages x $4.85 = $586.85

Audio Operator:            Courtroom ECRO Personnel

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

TELEPHONIC APPEARANCES:

For M. Stephen Peters:      Wadsworth Garber Warner Conrardy,
                            P.C.
                            By:  AARON J. CONRARDY, ESQ.
                            2580 W. Main Street, Suite 200
                            Littleton, CO 80120
                            (303) 296-1999

For Jeffrey Mosing and      McDowell Hetherington LLP
Mosing Autosport, LLC:      By:  JARROD MARTIN, ESQ.
                            1200 Smith Street, Suite 1400
                            Houston, TX 77002
                            (713) 356-1280

                            Chamberlain, Hrdlicka, White,
                            Williams & Aughtry
                            By:  REAGAN H. GIBBS, III, ESQ.
                            1200 Smith Street, Suite 1400
                            Houston, TX  77002-4310
                            (713) 654-9615

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page3 of 122

3

**I N D E X**
9/3/21

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE PLAINTIFF: | | | | |
| Jeffrey Mosing | 13 | 32 | 58 | -- |
| Tracy Stephenson | 62 | 76 | 85 | -- |

| EXHIBITS | ADMITTED |
|---|---|
| Plaintiff's 1 through 7 | 5 |
| Plaintiff's 8 through 11 (by stipulation) | 6 |

| | Page |
|---|---|
| OPENING STATEMENT BY MR. CONRARDY | 6 |
| OPENING STATEMENT BY MR. MARTIN | 9 |
| CLOSING ARGUMENT BY MR. CONRARDY | 89 |
| CLOSING ARGUMENT BY MR. MARTIN | 105 |
| REBUTTAL ARGUMENT BY MR. CONRARDY | 118 |
| REBUTTAL ARGUMENT BY MR. MARTIN | 119 |

4

```
 1          (Proceedings commence at 9:31 a.m.)
 2              THE COURT:  Please be seated.  Good morning,
 3   everyone.
 4              COUNSEL:  Good morning.
 5              THE COURT:  All right.  We are here today in Case
 6   Number 19-1211, Peters v. Mosing, et al.  Could I get
 7   appearances for those present in the courtroom today, please?
 8              MR. CONRARDY:  Good morning, Your Honor.  Aaron
 9   Conrardy on behalf of Steve Peters, the Chapter 7 Trustee.
10              THE COURT:  Thank you.
11              MR. MARTIN:  Good morning, Your Honor.  Jarrod Martin
12   and Tres Gibbs for Jeff Mosing and Mosing Autosports.  Here,
13   also, is Mr. Mosing in person.
14              THE COURT:  All right.  Thank you.  Welcome.
15              UNIDENTIFIED:  Thank you.
16              THE COURT:  And welcome to the state, gentlemen.
17              UNIDENTIFIED:  Thank you.
18              THE COURT:  All right.  This is kind of a new world.
19   This is, actually, the second trial we've had in person in the
20   course of the last week, and it's been a year.  So this is kind
21   of a new world for all of us.
22              So the rules we have is -- it's basically if you
23   folks are comfortable -- this is all on, you know, your comfort
24   level -- is when the witness is up there, we have the witness
25   take the mask off so we can understand and look at the face.
```

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21 53 Entered:09/10/21 16:24:44    Page5 of 122

5

1          When you're at the podium, you are welcome to take

2    off your mask if you so desire.  Other than that, please keep

3    masks up, and we'll go that route.

4          Okay.  Some preliminary matters.  There was a joint

5    pretrial statement, which was signed by the parties, and filed

6    at Docket Number 83.  The Court will accept that, and all of

7    the statement of undisputed facts are deemed as established in

8    the trial.

9          In comparing the exhibits that were referenced in

10   this to the Court's -- or to the parties' list of exhibits, it

11   appears that Exhibits 1 through 7 of the Trustee's exhibits,

12   which are also A through G, are set by both parties; and

13   therefore, we will deem those as admitted for all purposes.

14          (Plaintiff's Exhibits 1 through 7 admitted into evidence)

15          THE COURT:  Since the Trustee's going first, we will

16   use 1 through 7 as the exhibits for reference purposes and ask

17   that both parties refer to those exhibits by that number so we

18   won't have confusing references, in case of an appeal -- not

19   that anyone would ever think of appealing me.

20          So anyway -- so those are the preliminary matters out

21   of the way.  Are there any other -- from my vantage point.  Are

22   there any other preliminary matters we need to take care of

23   from the parties' standpoint?

24          MR. CONRARDY:  Yeah, Your Honor.  There are a few, I

25   think, small, minor matters.  Mr. Martin and I discussed the

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

6

1   stipulation of some additional exhibits, and those would be

2   Exhibits -- Trustee's Exhibits 8 through 11.  We'll just

3   stipulate to the admission to those.

4       (Plaintiff's Exhibits 8 through 11 admitted into evidence)

5           MR. CONRARDY:  And then in the Trustee's first

6   amended complaint, we're going to dismiss the third and fourth

7   claims for relief.  Those relate to -- those are 544 claims

8   under a reasonably equivalent value theory, and the Trustee's

9   not going to be prosecuting those claims at trial.

10          So we're just looking at the first, second, fifth,

11  and sixth claims.  The first is the 547 claim, the second is

12  the 544 claim, which is the judgement lien/execution creditor,

13  the fifth is the turnover claim, and the sixth claim is the

14  claim -- is just a declaratory relief as to the respective

15  parties' interest in the vehicle.

16          THE COURT:  All right.  Counsel, you are going to say

17  something or you're just exercising?

18          MR. MARTIN:  Yes, no, just one caveat on the exhibits

19  that are pleadings, such as the schedules and petition.

20  Just -- they're admitted, but not necessarily for the truth of

21  the matter asserted.

22          THE COURT:  I understand.  All right.  Opening

23  remarks?  Mr. Conrardy?

24          MR. CONRARDY:  Thank you, Your Honor.  Since the

25  stipulated facts are pretty robust, my opening statement's

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page7 of 122

7

1   going to be fairly short.  I'm going to try not to duplicate

2   what's already in the stipulated facts.  Instead, I'm just

3   going to add some extra testimony that we think's going to come

4   out to kind of supplement and add some meat to those facts.

5          The Court today is going to hear testimony from

6   Mr. Jeffrey Mosing and the Debtor, Mr. Tracy Stephenson, who

7   goes by "Trace," that they met in Austin, Texas in 2008 or

8   2009, they're both into exotic and classic cars, and developed

9   a business relationship based upon that shared interest.

10          Mr. Stephenson approached Mr. Mosing in about -- in

11   2011, looking for money to fund a construction company.

12   Mr. Stephenson initially wanted the transaction to be a

13   purchase of the vehicle at issue here for $120,000, but

14   Mr. Mosing then treated it as a loan.

15          The parties signed an agreement, which the Court's

16   aware of, and which was dated May 8th, 2012; and subsequently,

17   that same day, Mr. Mosing wrote a check for $120,000.

18          The memo line on the check, which was written by

19   Mr. Mosing, signed by him, and from his personal account,

20   states, and I quote, "one year capital loan."

21          And then at no time between 2012, the 2012

22   transaction, and the 2019 bankruptcy filing, did Mr. Mosing

23   take any action to foreclose the lien interest or the loan

24   against the vehicle.

25          And then, during the bankruptcy case, and about six

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page8 of 122

8

1    years after the transaction, on June 5th, 2019, Mr. Mosing

2    wrote a letter -- he co-wrote a letter with his manager of

3    Mosing Autosports, named Kirk Winterrowd, and he authorized

4    Mr. Winterrowd to sign the letter.  And in the letter, it

5    explicitly states that Mr. Stephenson borrowed $120,000, and

6    the vehicle -- I'm quoting -- "was put up as collateral."

7            Then, a few weeks later, on June 20th of 2019,

8    Mr. Mosing completed paperwork that was intended to be

9    submitted to the Texas DMV to have a certificate of title

10   issued for the vehicle.  It was signed in three different

11   places by Mr. Mosing, and the paperwork never was submitted,

12   but the paperwork -- there's a field that calls for the reason

13   for the title, and the reason stated is that it was in

14   connection with a loan.

15           The Court's also going to hear testimony that there

16   were no notations on the manufacturer's statement of origin,

17   which I'll just refer to as the "MSO," identifying any

18   transfers or liens.

19           And then, kind of, setting that testimony aside, with

20   respect to the 547 elements, Mr. Peters is going to testify

21   that this is the only significant asset of the estate that he

22   will be administering, and he does not anticipate 100 percent

23   payment to creditors.

24           And at the conclusion of testimony, we believe

25   there's enough evidence here for the Court to rule in the

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21   Entered:09/10/21 16:24:44    Page9 of 122

9

1    Trustee's favors on his claims.  Thank you, Your Honor.

2                THE COURT:  All right.  Thank you.

3                Mr. Martin.

4                MR. MARTIN:  Thank you, Your Honor.  Again, Jarrod

5    Martin for Jeff Mosing and Mosing Autosports.  I think

6    Mr. Conrardy is missing the point of what's going on here, and

7    it's the estate should not be allowed to benefit from the

8    debtor's fraud.  That's -- it's a very straightforward

9    principle.

10               When this agreement -- I know Mr. Conrardy likes to

11   call it a loan, but it was a contract.  There was no term,

12   there was no interest rate, it was a very simple contract with

13   certain conditions precedent that didn't occur.

14               When this agreement was entered into between

15   Mr. Mosing and Mr. Stephenson, there was no disclosure that a

16   title existed, and there was no disclosure that on that title,

17   there was a notation for a lien with Extraco Bank in the amount

18   of $70,000.

19               And Mr. Mosing is going to testify that if he had

20   known that information, we wouldn't be here today.  He never

21   would have entered into this deal.  Because why would a

22   business person like Mr. Mosing give Mr. Stephenson $120,000

23   for a vehicle that had a lien on it?

24               That lien was never disclosed to Mr. Mosing and he

25   didn't find out about it until this litigation commenced.  And

10

1  the purpose of a constructive trust is to prevent unjust

2  enrichment.  And if the Court allows the Trustee to claw back

3  this vehicle, it will result in a double dip.  Mr. Stephenson

4  will have received $120,000 for his construction business, and

5  his estate will get to keep the vehicle, and that's just not

6  fair.  And bankruptcy courts are courts of equity, and this

7  Court should not countenance that type of result for fraudulent

8  conduct.  Thank you.

9          THE COURT:  All right.  Thank you.

10         Mr. Conrardy, your first witness.

11         MR. CONRARDY:  The Trustee calls Jeff Mosing.

12         THE CLERK:  Sir, would you please raise your right

13  hand?

14          JEFFREY MOSING, PLAINTIFF'S WITNESS, SWORN

15         MR. CONRARDY:  Just give me a moment, Mr. Mosing.  I

16  plugged my laptop in here and I think it's searching -- the

17  system is searching for my laptop.

18    (Pause)

19         MR. CONRARDY:  It worked before?

20         THE CLERK:  Yes.

21         THE COURT:  Like I said, it's been a year.

22         MR. CONRARDY:  Still waking up.

23         THE CLERK:  Do you have it in the HDMI?

24         MR. CONRARDY:  Yeah, I do.  Yeah.

25         THE CLERK:  Okay.

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page11 of 122

11

  1                MR. MARTIN:  Did you try it earlier, Aaron?

  2                MR. CONRARDY:  Yeah, I tried it at about nine o'clock

  3   this morning and it worked.

  4                MR. MARTIN:  We came by yesterday for --

  5                THE COURT:  Yeah, I know you guys were here.  There

  6   are --

  7                MR. MARTIN:  There it goes.

  8                THE COURT:  I'm seeing something.

  9                MR. MARTIN:  I was just going to volunteer that we

 10   were having a little bit of difficulty at the lectern

 11   yesterday.  But, ultimately, it did work, so I don't know if

 12   there's just some sort of --

 13                MR. CONRARDY:  Yeah, I got it to work, you know, 30,

 14   45 minutes ago.

 15                THE COURT:  And if worse comes to worse,

 16   Mr. Conrardy, just plug it in at your station and see if that

 17   works.

 18                MR. CONRARDY:  Okay.

 19                THE COURT:  And you can operate from there if you

 20   need to.

 21                MR. CONRARDY:  Let me try --

 22                THE COURT:  We'll be flexible.  And again, this is

 23   something --

 24                MR. CONRARDY:  Thank you, Your Honor.

 25                THE COURT:  It's been a while.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page12 of 122

12

```
 1              MR. CONRARDY:  Let me try this.  I have a --

 2              MR. MARTIN:  There's an HDMI on your table, too.

 3              MR. CONRARDY:  There's a what?

 4              MR. MARTIN:  Oh, sorry.

 5              MR. CONRARDY:  Yeah, I'm using the HDMI.  Hold on,

 6    let me try this.  Sometimes a different adapter.

 7         (Pause)

 8              MR. CONRARDY:  Let's give this -- I'll give this one

 9    more shot and then I'll just move over to --

10              THE COURT:  Okay.  Well, it's not a big deal.  If

11    there's a problem, we'll get our systems guys up here and we

12    will get it working for both you guys.

13              MR. CONRARDY:  All right.  Let's see if that -- oh,

14    we got it.

15              THE COURT:  There it is.

16              MR. CONRARDY:  Okay.  Great.  Is there any way to,

17    until I bring up an exhibit, just keep the screen blank?

18              MR. MARTIN:  You have to unplug it.

19              THE CLERK:  I can do it from here.

20              MR. CONRARDY:  Oh, you can?  Okay.  All right.  Thank

21    you.  I'm worried about unplugging it.  Might have some more

22    issues.

23              MR. MARTIN:  Right.  Exactly.

24              THE COURT:  As long as we don't see smoke coming up

25    from there, we're okay.
```

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page13 of 122

Mosing - Direct                                    13

 1          MR. CONRARDY:  All right.  Okay.

 2          You ready, Ms. Mosing?

 3          THE WITNESS:  Yes, sir.

 4          MR. CONRARDY:  All right.  I just want to thank you

 5   for coming up here today.

 6                   DIRECT EXAMINATION

 7   BY MR. CONRARDY:

 8   Q    Can you please state your name for the record and spell

 9   it?

10   A    Jeffrey Louis Mosing, J-E-F-F-R-E-Y L-O-U-I-S M-O-S-I-N-G.

11   Q    Thank you.  And, Mr. Mosing, what is your affiliation with

12   Mosing Autosport, LLC, d/b/a Mosing Motorcars?

13   A    I'm the owner, sole owner and proprietor.

14   Q    Okay.  And is Mosing Autosports a licensed automobile

15   dealer?

16   A    Yes.

17   Q    And in which states?

18   A    Texas.

19   Q    Any other states?

20   A    No.

21   Q    Are you, as an individual, a licensed automobile dealer or

22   is it just the company?

23   A    Just the company.

24   Q    Okay.  And how do you know the debtor, Mr. Stephenson?

25   A    I was looking to purchase a Superformance GT40.  And at

1  that moment, or in time, I believe it was '07 or '08, I did a

2  internet search for the dealer in Texas and his name popped up

3  as the dealer in Texas for Superformance automobiles.

4  Q     Okay.  And can you briefly tell us what a Superformance

5  automobile is?

6  A     Superformance is a company that builds exact -- nearly

7  exact, replicas of cars that are similar to the one that we're

8  talking about.  They build five or six different chassis that

9  represent older cars, but they're built to, you know, built as

10 brand new cars.

11 Q     Okay.  Would it be fair to say that you met because you're

12 both car guys?

13 A     Absolutely.

14 Q     Okay.  And then, is your relationship with Mr. Stephenson

15 a business relationship or is there a personal relationship

16 there as well?

17 A     I'd always considered him as a friend, you know, through

18 the whole time that we first met.  We had multiple transactions

19 together and actually had lunch with him and his wife at the

20 time in Marble Falls, I believe, when I was going to visit

21 where his dealership was.

22 Q     Okay.  But would it be mostly a business relationship?

23 A     Mostly business.

24 Q     Okay.  And you're familiar with the 1965 Shelby that we're

25 here about today?

Mosing - Direct                    15

1  A    Yes.

2  Q    Okay.  And how are you familiar with that specific

3  vehicle?

4  A    I've had the car in my possession after purchasing it from

5  Trace back in 2000 and -- well, 2013.

6  Q    Okay.  And is there anything special about that car?

7  A    The Shelby Cobras are already particularly rare, but this

8  one is one of, I believe, four that have been built, five that

9  were supposed to be built, carbon fiber bodied Cobras.  There's

10 either fiberglass bodies, aluminum, or the few carbon fiber

11 body cars that got built.

12 Q    Oh, so this is a carbon fiber body.  Is this the first or

13 second of the carbon fiber Cobras that were built?

14 A    I don't know the sequence of numbers.  I'd have to go look

15 it up.  But the serial number is 4501, so it was either the

16 first or second.

17 Q    Okay.  All right.

18      MR. CONRARDY:  Could you turn the monitor on for me,

19 please?  All right.

20 BY MR. CONRARDY:

21 Q    So we're going to look -- take a look at this agreement

22 that's marked -- that has been admitted as Exhibit 3.  And so,

23 Mr. Mosing, one little tricky part about presenting evidence

24 electronically, instead of with a notebook, is if it was in a

25 notebook you could flip back and forth on your own.  So

Mosing - Direct                                    16

1    whenever I bring up an exhibit today, if you need me to scroll

2    down, or you want to look at another page, just let me know and

3    I'll accommodate.

4    A    Okay.

5    Q    All right.  So what's been admitted as Exhibit 3 is this

6    agreement that's dated May 8th, 2012.  Do you recognize this?

7    A    Yes.

8    Q    And are you familiar with this agreement?

9    A    Yes.

10   Q    And is that your signature near the line that says Jeff

11   Mosing?

12   A    Yes.

13   Q    And is that Mr. Stephenson's signature underneath it?

14   A    Yes.

15   Q    And who do you know that that's Mr. Stephenson's

16   signature?

17   A    I watched him sign it.

18   Q    Okay.  And where was this signed?

19   A    It was at my building on Braker in Austin, my dealership.

20   Q    Your dealership?  Okay.  And so you both signed this

21   around the same time.

22   A    Correct.

23   Q    Okay.  And then, who's Eric Beverding?

24   A    Eric Beverding was my manager at the time.

25   Q    Okay.  Is he your manager anymore?

Mosing - Direct                          17

1   A    No.

2   Q    Okay.  And this agreement, it looks like it's between you

3   individually and Mr. Stephenson.  Is that right?

4   A    Correct.

5   Q    Okay.  Mosing Autosports isn't a party to the agreement?

6   A    Correct.

7   Q    Okay.  All right.  So now this has been admitted as

8   Exhibit 4, and do you recognize this, Mr. Mosing?

9   A    I do.

10  Q    And what is this?

11  A    This was a check that I submitted to Trace for the Cobra.

12  Q    Okay.  And that's your handwriting on the check, right?

13  A    Correct.

14  Q    And that's your signature?

15  A    Yes.

16  Q    Okay.  And in the memo line it says, "one year capital

17  loan."  Do you see that?

18  A    Yes.

19  Q    And you wrote that, right?

20  A    Correct.

21  Q    Okay.  And it looks like the check was from your personal

22  account.  Is that correct?

23  A    Yes.

24  Q    All right.  And it wasn't from a business account.

25  A    Correct.

Mosing - Direct                    18

1  Q    Okay.  Now we're going to go to what's been admitted as

2  Exhibit 5, and this is the June 5th, 2019 letter.  That's what

3  we've been referring to it as.  And do you recognize this,

4  Mr. Mosing?

5  A    Yes.

6  Q    Okay.  You kind of hesitated there.  Do you need to look

7  at it for a little longer?

8  A    No, I remember -- yeah, I remember this one.

9  Q    Okay.  Yeah.  And then the second page of it is a copy of

10 the agreement, right?

11 A    Uh-huh.

12 Q    Okay.  Just going to scroll up.  All right.  So are you

13 familiar with this letter, Mr. Mosing?

14 A    Yes.

15 Q    All right.  And it looks like it's signed by Kirk

16 Winterrowd as general manager of Mosing Motorcars.  Who's

17 Mr. Winterrowd?

18 A    He's the successor to Eric Beverding that was managing my

19 business.

20 Q    Okay.  And what do his responsibilities include?

21 A    He does pretty much everything.  Takes care of the utility

22 bills, does the sales, answers phone calls, does -- writes up

23 the purchase agreements for anything that we're selling and

24 buying through the dealership.

25 Q    Okay.  And you and Mr. Winterrowd drafted this letter

Mosing - Direct                              19

1   together, right?

2   A    Yes.

3   Q    And that is, in fact, Mr. Winterrowd's signature at the

4   bottom?

5   A    Yes.

6   Q    And you authorized him to sign it, correct?

7   A    Yes.

8   Q    Okay.  And let's see if I can do the highlighting here.

9   So in this letter, I'm going to read this first paragraph.  It

10  says, "Per the attached agreement", which is -- we've seen as

11  the agreement we were just talking about -- "let it be known

12  that on May 8th, 2012, Trace Stephenson entered into an

13  agreement with Jeff Mosing to borrow $120,000 and that Trace

14  Stephen (sic) put up as collateral a 1965 Shelby Cobra 427 CSX

15  4501."

16      The Shelby Cobra that's mentioned there is the one we're

17  talking about today, right?

18  A    Correct.

19  Q    And did I read that correctly?

20  A    Yes.

21  Q    Okay.  And you used the word "borrow."  Is that right?

22  A    That's what's -- yes.

23  Q    Yeah.  So is it -- if someone borrows money, isn't that a

24  loan?

25  A    Yeah.  If someone borrows money, it's a loan.  But with

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

1   the arrangement that we had, it was a one-year agreement for

2   him to purchase the car back, which he never followed through

3   with.

4       So at that point, the -- as Page 2, per the agreement, I

5   would end up taking ownership of the car.  If he'd have paid me

6   back within that one year, then for all tax purposes, at that

7   point, would have been --

8           MR. CONRARDY:  Objection.  Non-responsive.  It was --

9           THE COURT:  Actually, it was responsive.  I'll let

10  him finish off his answer.

11          MR. CONRARDY:  Okay.

12          THE WITNESS:  In retrospect, at that point, it would

13  have -- it would have appeared to anyone, especially the IRS,

14  that this was some sort of short-term loan, that I would be

15  having to pay taxes on whatever increase in value that I

16  received back for the car.

17  BY MR. CONRARDY:

18  Q    All right.  So you just said it was a short-term loan,

19  that's -- right?

20          MR. MARTIN:  Objection.  Mischaracterizes the

21  testimony.

22          THE COURT:  Rephrase the question, if you would.

23          MR. CONRARDY:  Okay.

24  BY MR. CONRARDY:

25  Q    You just mentioned "short-term loan."  What did you mean

Mosing - Direct                                21

1  by that testimony?

2  A    It was a purchase agreement between Trace and I, and he

3  had the opportunity to purchase the car back after -- within

4  that one-year period.  If not, Trace also admitted after that

5  fact that I was the owner of the car.

6  Q    And then at the bottom here, it says, "As of this date,

7  June 5th, 2019, no payments have been made from Trac Stephenson

8  to Jeff Mosing, nor has the title for the 1965 Shelby Cobra 427

9  CSX 4501 been sent to Jeff Mosing."

10        You referenced the title there, so you knew that there was

11  a title for the vehicle, correct?

12  A    I had no knowledge of a title existing until this lawsuit

13  appeared.

14  Q    All right.  Let's go to -- we're going to look at Exhibit

15  6, or what's been admitted as Exhibit 6.  And this is the DMV

16  application that you completed for Texas.  Do you want me to

17  scroll down so you can familiarize yourself with it?

18  A    Yes.

19  Q    Okay.  So just kind of tell me to slow down or speed up,

20  or -- all right.  Are you ready for me to ask you some

21  questions about this?

22  A    Let's go back to Page 2.

23  Q    All right.

24  A    Okay.  Hold it.

25  Q    Do you want me to scroll up or down?

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Mosing - Direct                                      22

1   A    Okay.  Yeah, you can scroll.

2   Q    Okay.  Can I ask -- are you ready for some questions?

3   A    Yes.

4   Q    Okay.  All right.  All right.  So after you've looked at

5   these, you recognize the documents?  Do you recognize them

6   after looking at --

7   A    Yes.

8   Q    Okay.  And these relate to the vehicle.  Is that correct?

9   A    Yes.

10  Q    All right.  And we saw a few signatures on here.  For

11  instance, let's see, there's one -- there are a couple more.

12  There's one, and there's another one.  Are those your

13  signatures, Mr. Mosing?

14  A    Yes.

15  Q    Okay.  And the purpose of these documents was to obtain a

16  Texas title for the vehicle.  Is that correct?

17  A    Correct.

18  Q    Okay.  And you were the applicant.  Is that right?

19  A    Yes.

20  Q    Not Mosing Autosports.

21  A    Correct.

22  Q    Okay.  And now, right here, on Line 15, it says, "Is the

23  vehicle 25 or more years old?  If yes, what is the current

24  value of the vehicle?"  And you wrote in $150,000.  Is that

25  right?

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Mosing - Direct                                23

1  A    This was all filled out by Kirk and I signed it.

2  Q    Okay.  But you reviewed it before you signed it, right?

3  A    I did, yeah.

4  Q    Okay.  You don't contest that that was the value.  Is that

5  right?

6  A    It's -- it's an estimate, correct.

7  Q    Okay.  Could it be worth more than $150,000?

8  A    Could be worth more, could be worth less.  It's whatever

9  the market's, you know, at the time is going to demand.

10  Q    All right.  Fair enough.  And this says here the car was

11  given as payment for a loan.  Is that right?

12  A    Correct.

13  Q    Okay.  Did you ever do anything to foreclose the loan?

14  A    No, because we didn't have a loan.

15  Q    Okay.  And this application was never submitted, correct?

16  A    Correct.

17  Q    And Texas has never issued either you or Mosing Autosports

18  a title for the vehicle, right?

19  A    Correct.

20  Q    Okay.  And I think I may have asked this, but where is the

21  vehicle located now?

22  A    It's at my building on Research.  It's about two miles

23  south of the original building.

24  Q    Okay.  Is it in a secure location?

25  A    Yes.

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Mosing - Direct                    24

1  Q    Okay.  All right.  Let's go to what's been admitted as

2  Exhibit 7, and -- oops.  Hold on here.  And do you recognize

3  this?

4  A    Yes.

5  Q    And what is this, Mr. Mosing?

6  A    It's a MSO for the Shelby Cobra.

7  Q    Okay.  Are there -- on this MSO, I don't see -- there are

8  no endorsements, are there?

9  A    Just Carroll Shelby's signature.

10 Q    Okay.  No notes about ownership transfers?

11 A    Correct.

12 Q    No notes about liens?

13 A    Correct.

14 Q    Okay.  All right.  You've mentioned -- you testified that

15 you don't -- you're not characterizing this transaction as a

16 loan.  In the case, the Trustee served some interrogatories

17 upon you.  Do you recall those?

18 A    I'm sorry.  Can you clarify that question?

19 Q    Yeah.  So during the case, the Trustee -- I'll take my

20 mask down --

21 A    No worries.

22 Q    -- I don't know why I still have it on.  During the case,

23 the Trustee served some interrogatories on you.  Are you

24 familiar with what that is?

25 A    No.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Mosing - Direct                    25

1   Q    No?   Okay.   Well, I'll show them to you and maybe that

2   will kind of refresh your recollection.

3        (Pause)

4   BY MR. CONRARDY:

5   Q    All right.   So these are the responses to some

6   interrogatories that were served upon you, and you can see

7   here, your attorney, Jarrod Martin, signed them.   And what it

8   does here is, you'll see, there are a bunch of objections.

9        And then we go down, there are some requests for

10  admissions.   I'm going to skip those.   And then we go to

11  Defendant's Objections/Responses to Defendant's First Set of

12  Interrogatories.   And how it works is, you'll see in the first

13  paragraph it says, one, and it says, "To the extent you

14  denied," et cetera.   So that was the interrogatory that the

15  Trustee asked, and then your response was below.

16       Do you recognize any of these?

17  A    It's been a while, but --

18  Q    It's been a while.

19  A    Yeah.

20  Q    But you recall, kind of, helping your attorney complete

21  these, right?

22  A    Correct.

23  Q    Okay.   So I'm going to go down to Interrogatory 14.   Hold

24  on here.   Oh, wrong one, Interrogatory 15.   So the question

25  was, "State completely, and in detail, any attempt you made to

Mosing - Direct                           26

1  protect your security or ownership interest in the vehicle.  If

2  no such attempt was made, so state and explain why no attempt

3  was made."

4       And your response was, "Defendants'" -- "Incorporate by

5  reference Defendants' Motion to Dismiss, ECF No. 24, in which

6  Defendants outline the factual basis of the transaction.

7  Mosing asked Debtor if the car was free and clear, and the

8  Debtor stated that the car was free and clear" -- wow, man, I

9  am -- hold on.  I'm reading the wrong one.  I am so sorry.

10  We're looking at 15.

11            MR. MARTIN:  It's 15, Line 3, where it says, "The

12  Debtor offered Mosing the car in" --

13            MR. CONRARDY:  -- "car in exchange for" --

14            MR. MARTIN:  -- "the loan."

15            MR. CONRARDY:  -- "the loan."

16  BY MR. CONRARDY:

17  Q    So I'm having a hard time -- well, here, in an

18  interrogatory, you said it's a loan; but you're telling me

19  today that it was some other type of agreement.  So can you

20  help me understand why it's not a loan?

21  A    The only thing that I have with Trace's signature was a

22  purchase agreement.  I never presented him with any type of

23  document or form, in any way, shape, or form.  I'm not a bank.

24  I'm a car dealer.

25       And so, you know, I purchase and sell cars.  And as a

Mosing - Direct                               27

1  friend, I offered to hold the car for one year and he could

2  have the opportunity to buy it back.  Anybody looking from the

3  outside in would say, well, that looks like a short-term loan.

4  But at no point did I present any documentation to Trace saying

5  that this was a loan.  It was a purchase agreement.

6  Q    So you mentioned you're a car dealer.  How long have you

7  been car dealer?

8  A    I believe we obtained our license in '11.

9  Q    In 2011?

10 A    Yes.

11 Q    Okay.  And during that time, have you ever -- has anyone

12 come and purchased a car with a loan or financed the purchase

13 of a car?

14 A    No.  We eventually partnered up with JJ Best, so if anyone

15 was looking to purchase a car, they could -- we would reference

16 them to JJ and they could get approval for a loan through them,

17 but we had no -- we didn't do any financing through the

18 dealership.

19 Q    But the financing -- but you're familiar with the concept

20 of financing and getting a lien on a car to secure the loan,

21 correct?

22 A    Sure.

23 Q    Okay.  And that would be, if someone was loaning money to

24 purchase a car, it would be prudent to note a lien on the

25 title, right?



Mosing - Direct                              28

1  A    Correct.

2  Q    Okay.  And there was -- let me see here.  Recently, you

3  had amended your responses to some requests for admissions.  Do

4  you recall that?

5  A    I'd have to go back and talk with my attorneys about it,

6  but I'm believing, yes, we did.

7          MR. CONRARDY:  Just let the record reflect that one

8  of the attorneys was nodding yes.

9  BY MR. CONRARDY:

10 Q    So anyway, this was filed with the Court very recently, I

11 think in the last couple of weeks, and there's a Request for

12 Admission Number 3, that the Trustee served on you.  It says,

13 "Admit that pursuant to the agreement, you loaned Debtor

14 $120,000."

15     The initial response was, "Defendants admit that $120,000

16 was loaned to the Debtor, according to a repayment schedule.

17 Otherwise, denied."  Did I read that correctly?

18 A    Yes.

19 Q    And then the amended response, which was just prior to the

20 trial, says, "Defendants provided $120,000 to the Debtor,

21 according to an agreement with a repayment schedule.

22 Otherwise, denied."

23     Isn't a repayment schedule in connection with a loan?

24 A    The repayment schedule was to buy back the vehicle within

25 a year for X amount of dollars, either three months, six

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Mosing - Direct                          29

1  months, or nine months.  None of those terms were met, so we

2  agreed, after one year, that I was owning the car.

3  Q    So you think this was a loan or, like, a pawn transaction?

4  A    Kind of similar to a pawn shop transaction.  If I had

5  something of value that I needed money and not the vehicle, or

6  whatever it is, and I have the opportunity to go back and

7  purchase that at a higher price.

8  Q    Are you a licensed pawn dealer in Texas?

9  A    No.

10 Q    Would you consider this Exhibit 3 agreement a pawn ticket?

11 A    No.

12 Q    No.  Are you familiar with pawn transactions?

13 A    Vaguely.

14 Q    Okay.

15 A    On the purchase side, I guess.

16 Q    Have you ever done consignments or pawns for your car

17 dealership?

18 A    No.

19 Q    Never done a consignment?

20 A    We've done consignments --

21 Q    Okay.

22 A    -- for vehicles, yes.

23 Q    There are no notations on this agreement that you had, I

24 suppose, in your words, kind of, transferred the car to you.

25 Is that right?

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Mosing - Direct                    30

1   A    Can you repeat it, please?

2   Q    There are no notations on this agreement of any kind,

3   other than what we see here.  Is that correct?

4   A    Correct.

5   Q    All right.  Are there any independent documents of

6   transferring the title of the Cobra to you?

7   A    No.

8   Q    And I think the only step that you've really taken to

9   become a record owner in the Cobra is by preparing the DMV

10  paperwork.  Is that right?

11          MR. MARTIN:  Objection.  Mischaracterization.

12          THE COURT:  Rephrase the question, please.

13  BY MR. CONRARDY:

14  Q    All right.  Other than preparing the DMV paperwork, which

15  is Exhibit 6, what else have you done to perfect your purported

16  ownership interest in the vehicle?

17  A    I've continued to insure the car to this day, since I've

18  taken ownership of it.

19  Q    But that's it?

20  A    That's all I needed to do.  The MSO is the only thing that

21  I would need to own the car.

22          MR. CONRARDY:  Objection.  Legal conclusion.

23          THE COURT:  I recognize it as a legal conclusion.

24  Just go ahead and --

25          MR. CONRARDY:  Okay.  Thank you, Your Honor.

Mosing - Direct                                    31

BY MR. CONRARDY:

Q    Have you ever filed a lawsuit to enforce this agreement?

A    No.

Q    No.  Okay.  Have you ever sent a demand letter to -- prior
to the bankruptcy case, to Mr. Stephenson on the agreement?

A    Other than the one that Kirk filled out?

Q    Yeah, other than that.

A    Okay.  No, not that I recall.

Q    Okay.  Have you ever sued Mr. Stephenson?

A    No.

Q    Okay.  Other than kind of what we've looked at today, are
there any other emails or communications between you and
Mr. Stephenson regarding title to the vehicle?

A    No.

Q    Okay.  No letters regarding title?

A    No.

Q    No text messages regarding title?

A    I don't believe, no.

Q    Okay.  Were there any written representations signed by
Mr. Stephenson regarding the title?

A    No.

Q    Okay.  Have you ever made a national search for the
vehicle's title?

A    No.

Q    Did you ever search Colorado records for the title?

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

Mosing - Cross                                    32

1  A      No.

2  Q      What about Texas?

3  A      No.

4  Q      Did you ever email Mr. Stephenson requesting the title?

5  A      No.

6  Q      And did you ever send him a written letter requesting the

7  title?

8  A      No, not that I recall.

9  Q      Any text messages?

10 A      Not that I recall.

11         MR. CONRARDY:  Okay.  I think that's the questions I

12 have for Mr. Mosing for now, with the reservation for redirect;

13 and Mr. Martin and I discussed, before the hearing, that we're

14 just going to do our cases simultaneously to save time.

15         THE COURT:  Okay.  That's fine.

16         MR. CONRARDY:  Okay.

17         THE COURT:  That's pretty typical.  Thank you.

18         MR. CONRARDY:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20 BY MR. GIBBS:

21 Q      Morning, Mr. Mosing.

22 A      Morning.

23 Q      The counsel for the Trustee asked you quite a few

24 questions.  My intent is not to recover any ground that's

25 already been covered by the Trustee.  There may be a little bit

Mosing - Cross                                33

1   of overlap that may be unavoidable, but I'll try to -- I'll try

2   not to do that too much.  But I do think it's important,

3   Mr. Mosing, to give the Court a little bit of background about

4   yourself.  And so can you just tell us briefly, where are you

5   from originally?

6   A    Born and raised in Lafayette, Louisiana.  Moved to Austin,

7   Texas in 2006.

8   Q    And what led you to Austin?

9   A    I have a son with autism.  And at that period in time, my

10  wife and I couldn't find the resources we needed for our son.

11  So there was a school that we wanted to put our son in, in

12  Austin, so we ended up moving.

13  Q    Fair enough.  And how did you get into this industry of

14  the, kind of, specialty motor cars?

15  A    I mean, cars have been a part of my life, pretty much all

16  my life.  My oldest brother was a big influence.  I mean, as

17  early as five years old, he would allow me to help him work on,

18  you know, different cars.  And to this day, we still hang out

19  doing car stuff together.

20       It's always been a part of my life and dealing with cars

21  was always something that I wanted to do.  I just, the right

22  time and the right place happened, you know.  About 2009, 2010,

23  I started working on a plan, purchased a building where I was

24  going to have the dealership, and then got my license, and

25  started dealing with cars.

Mosing - Cross                              34

1   Q    And you mentioned you got your license.  What does that
2   process look like?  What did you have to do to get licensed in
3   Texas?
4   A    In Texas, they require, like, a physical location.  So you
5   can't just, like, work from home and, you know, get a license
6   from there.  You have to have signage, you've got to have a
7   showroom.
8        We got a waiver with the particular property that we had.
9   We couldn't -- we couldn't leave cars outside overnight.  It
10  was just a stipulation there that we had to have all the cars
11  inside, but we didn't -- we weren't dealing with that many
12  cars.  I mean, at the most, I would anywhere from 25 to 30
13  cars, you know, in inventory.  It's more a niche, you know,
14  kind of thing to do, just dealing with classics, exotics,
15  off-the-wall kind of things that you normally don't drive every
16  day.
17  Q    Right.  Thank you.  And just estimate, rough estimate, if
18  you can, how many vehicles do you think Mosing Autosports has
19  sold since you guys started?
20  A    We've probably sold anywhere from 150 to 200.  So it's,
21  like I said, a relatively low volume.  It's more matching up
22  the right person with the right car, you know, but it's
23  somewhere around there, I think, about 200.
24  Q    And how do you confirm the title on the vehicles that you
25  sell?

Mosing - Cross                                    35

1  A     Say again?

2  Q     How do confirm title on the vehicles that you sell, that

3  the vehicles are titled?

4  A     Well, any vehicles that we do on consignment, we have the

5  owners present the vehicle to us, and they'll bring the

6  paperwork also.  And at that point, we can determine, you know,

7  if there's a lien on it or if -- well, typically, if there's a

8  lien on it, the title would be at the bank anyway.

9  Q     Right.

10  A     But just about everything that we've dealt with are clear

11  titles.  In a few cases we've had cars that had liens on them

12  and we've had to work the funds out to pay the note off, and

13  then acquire the title, and then do the proper transfer of

14  paperwork to the new owner.

15  Q     Thank you, Mr. Mosing, for that background.  I appreciate

16  that.

17  A     You bet.

18  Q     I'd like to switch gears and kind of catch up, discuss the

19  reason we're here today.  There was some discussion earlier

20  about, I guess, how you met the Debtor, Mr. Stephenson.  Could

21  you refresh me real quick, Mr. Mosing.  You were the one that

22  originally contacted Mr. Stephenson, and I think you mentioned

23  it was around 2007 or 2008?

24  A     Yes.

25  Q     Is that right?



1  A    Uh-huh.

2  Q    What was the purpose behind that again?

3  A    I was looking to purchase a Superformance GT40, which is a

4  replica of a car that Ford developed for racing.  And like I

5  said, he was the distributor in Texas.  So that's when I

6  contacted him and started getting the information on what the

7  vehicle was going to cost and what kind of time frame, you

8  know, to get it.  I think it was anywhere from, maybe, six to

9  eight months before, you know, it had come in.  They come out

10 of South Africa, where they get built.

11 Q    So in 2007 and 2008, or 2008, you first contacted

12 Mr. Stephenson and you, in fact, did purchase that GT40?

13 A    Yes.

14 Q    And could you tell us, Mr. Mosing, when you purchased that

15 vehicle, did that vehicle come -- did Mr. Stephenson deliver it

16 with a title, did it have an MSO, both, either?

17 A    It was delivered --

18        MR. CONRARDY:  Wait.  Hold on.  I want to lodge an

19 objection to relevance, and I want to add some color to that.

20 In the Trustee's interrogatories, we asked for a description of

21 all transactions with -- between Mr. Mosing and Mr. Stephenson,

22 and their response to the interrogatory was they weren't going

23 to provide any information because it was irrelevant.  So

24 what's irrelevant during discovery cannot now be relevant.

25        MR. GIBBS:  Your Honor, we covered this ground in

Mosing - Cross                                    37

1  deposition at length.  I think it's been covered.

2              THE COURT:  Was it discussed in a deposition?

3              MR. CONRARDY:  It was discussed at a deposition.

4              THE COURT:  Objection overruled.

5              MR. GIBBS:  Thank you, Your Honor.

6              Go ahead, Mr. Mosing.  I'm sorry.

7              THE WITNESS:  So when I agreed to purchase the car, I

8  believe I put a deposit down and then paid the remaining

9  balance once the car was delivered.  Comes in a, basically,

10 crate, not -- mostly assembled.  The wheels aren't on it.

11 There's no powertrain in the vehicle.  That's up to the owner

12 how they want to finish configuring it.

13             Along with the delivery of the vehicle, all I'm given

14 is a similar MSO to what the Shelby had.

15 BY MR. GIBBS:

16 Q    No title, correct?

17 A    Correct.

18 Q    Do you know why there was no title?

19 A    You can -- well, at the time, federal law was not allowing

20 complete vehicles to be built and sold as new vehicles, as the

21 one that we're talking about.  It's a low volume type of deal.

22 But they could sell them as component cars without the

23 powertrain.

24     And we couldn't -- we actually couldn't title the car and

25 register it until the powertrain was complete, and it was

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

Mosing - Cross                    38

1   actually under its running -- you know, where we could do

2   safety inspections and everything on the car.

3        So then at that point, after we completed the car, I was

4   able to go and -- go to DMV and I produced the MSO to them,

5   insurance, proof, and they submitted a title for me.

6   Q    Thank you.  Okay.  So that's the GT40.  Did you have any

7   other transactions with Mr. Stephenson where you're purchasing

8   vehicles from him?

9   A    I did.  I purchased a pair of Corvettes.  One was a '66,

10  the other one was a '67.  I purchased a Cobra Daytona coupe,

11  which is a variation on the Cobra that we have here today.

12  Q    Okay.

13  A    Yes.

14  Q    Thank you.  Going back to the Corvettes, was that a

15  situation -- we talked earlier about the GT40 --

16  A    Uh-huh.

17  Q    -- and we talked about how you approached

18  Mr. Stephenson --

19  A    Uh-huh.

20  Q    -- because you were interested in that car and you knew he

21  was a licensed dealer.

22  A    Uh-huh.

23  Q    On the Corvettes, was it a similar situation where you

24  approached him because you identified that he had some cars

25  that you wanted?

Mosing - Cross                                    39

1            MR. CONRARDY:  Objection.  Leading the witness.

2            THE COURT:  Rephrase the question, please.

3            MR. GIBBS:  Thank you.  I will.

4   BY MR. GIBBS:

5   Q    Who contacted who, Mr. Mosing, about these Corvettes that

6   you just testified about?

7   A    To my recollection, I believe he had called me and just

8   mentioned that he had these cars.  They were -- that they were

9   available, that he was trying to sell them --

10  Q    Okay.

11  A    Yeah.

12  Q    And clearly, you were interested, or you wouldn't have

13  bought them, I assume.

14  A    Yes.

15  Q    Sorry.

16           MR. CONRARDY:  Objection.  Leading the witness.

17           MR. GIBBS:  I can rephrase.

18           MR. CONRARDY:  Thank you.

19           MR. GIBBS:  And I can move on.

20  BY MR. GIBBS:

21  Q    And tell me about the Shelby Daytona, Mr. Mosing.

22  A    The Shelby Daytona coupe, originally, there was, I

23  believe, six cars that were built back in the '60s.  Carroll

24  Shelby had a continuation of MSOs.  I believe there were 14

25  additional MSOs, but no cars had been built yet.

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Mosing - Cross                    40

1    He commissioned Mike McCluskey out of Venice to be the

2    exclusive guy that fabricated these cars, and they take

3    anywhere from three to five years to complete, because it's all

4    hand-built from the ground up.  Aluminum body.

5        I purchased the vehicle from Trace, I believe it was 2009,

6    maybe, somewhere around November of 2009, and then it took a

7    few years for McCluskey to complete it.

8    Q    And what about that vehicle, Mr. Mosing, when you acquired

9    it, did you obtain it with an MSO, or a title, or both?

10   A    It was just --

11            MR. CONRARDY:  Objection.  Leading the witness.

12            THE COURT:  Overruled on that one.

13            MR. GIBBS:  Thank you, Your Honor.

14            THE WITNESS:  It was purchased with just the MSO.

15   BY MR. GIBBS:

16   Q    And I'm sorry, I didn't ask you about the Corvettes.  What

17   about the Corvettes, Mr. Mosing?

18   A    Those were just titles.

19   Q    So just titles on the Corvettes, correct?

20   A    Uh-huh.

21   Q    And MSOs on these -- the Shelbys.

22   A    Correct.

23   Q    Thank you.

24            MR. GIBBS:  Your Honor, I'd like to move forward, but

25   I'm not sure if my monitor's working here, with the HDMI cord,

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

1  so I may need to --

2          THE COURT:  We'll try it.  Like I said, as long as I

3  don't see smoke, I'm fine.

4          MR. GIBBS:  Do you mind if I switch gears and go --

5          THE COURT:  Sure.

6          MR. GIBBS:  -- to the counsel table?

7          THE COURT:  Sure.  I can live with that.

8          MR. GIBBS:  Thank you, Your Honor.

9      (Pause)

10          MR. GIBBS:  If you don't mind, can I question --

11          THE COURT:  Sure, sure.

12          MR. GIBBS:  Thank you.

13          THE COURT:  We're not going to stand up for

14  formalities under these circumstances.

15          MR. GIBBS:  I appreciate that.

16          THE COURT:  And you have the same ability to do,

17  Mr. Conrardy.  If you want to feel more comfortable at your

18  chair there examining, feel free.

19          MR. CONRARDY:  Okay.  Thank you, Your Honor.  Might

20  take you up on that.

21          THE COURT:  I'll just ask that when you object, still

22  stand up.

23          MR. CONRARDY:  Okay.

24          THE COURT:  You don't have to stand up while you're

25  examining.

                              Mosing - Cross                    42

 1              MR. CONRARDY:  Okay.

 2              THE COURT:  That's going to be a little difficult.

 3              UNIDENTIFIED:  Simon says.

 4              MR. GIBBS:  I'm a little out of practice, too, Your

 5   Honor, so --

 6              THE COURT:  Don't worry about it.  We're not super

 7   formal.

 8   BY MR. GIBBS:

 9   Q    Mr. Mosing, I have here up on the screen, this has been

10   marked as Plaintiff's Exhibit 2, and it's in evidence --

11              MR. MARTIN:  Will be.

12              MR. GIBBS:  -- will be in evidence.

13              MR. MARTIN:  No, I think it's Exhibit B.

14              MR. GIBBS:  Well, he wants us to refer to the

15   Plaintiff's numbers, right?

16   BY MR. GIBBS:

17   Q    Mr. Mosing, do you recognize this document?

18   A    Yes.

19   Q    Could you tell the Court briefly what this is?

20   A    It was initial contact from Trace as a proposal to

21   purchase the Cobra.

22   Q    The Cobra that's the subject of this lawsuit?

23   A    Yes.

24   Q    Was there any discussion with Trace about the Cobra before

25   you received this email, that you recall?

Mosing - Cross                                43

1  A      Not that I recall.

2  Q      And so I just want to look at this a little bit and what's

3  the date here, Mr. Mosing, that it was sent?

4  A      April 19th, 2012.

5  Q      And looking down --

6          THE COURT:  Tell them "Hi."

7  BY MR. GIBBS:

8  Q      Looks like we have -- do you see where it says purchase

9  price of $120,000?

10 A      Yes.

11 Q      What is the significance of that, just four words, to you,

12 "purchase price of $120,000"?

13 A      I mean, it was -- I was buying the vehicle.  And just

14 below that, as it states, he had the opportunity to buy it back

15 within a year for incremental -- incrementally more amounts

16 than what I had purchased it for.

17 Q      And who came up with this idea that Trace could purchase

18 the Cobra back for, I guess, up to 12 months after the

19 transaction?

20 A      He brought it -- he brought it to me.

21 Q      This is his proposal to you.

22 A      Yes.

23 Q      And including the step-up numbers that we see there, the

24 130, 140, 150?

25 A      Yes.

Mosing - Cross                    44

1  Q    That was Tracy's idea, as well?

2  A    Yes.

3  Q    And what is -- let's see, the language underneath that,

4  the next line, you would obviously taken possession of the

5  Cobra immediately, with the original MSO.  The Cobra would stay

6  on the original MSO until our agreement ends.

7       Mr. Mosing, what is the significance, in your mind, if the

8  Cobra would stay on the original MSO?  What does that mean to

9  you?

10 A    I wouldn't -- I wouldn't file for title within that

11 one-year period during our agreement.

12 Q    Meaning it would stay, basically, under the MSO?

13 A    Correct.

14 Q    As opposed to a title.

15 A    Correct.

16 Q    And then, until agreement ends, what -- when would that

17 occur based on your understanding of this email, Mr. Mosing?

18 A    This agreement would terminate one year to the date that

19 we signed it.

20 Q    Is there anything in this email proposal to you to signify

21 whether or not this vehicle had been titled?

22 A    Can you say it again?  I'm sorry.

23 Q    Yeah, sure.  That's probably four questions.  Is there

24 anything in this email -- and here, let me let you look at the

25 whole thing.  Let me know if you need me to -- is there

Mosing - Cross                                   45

1  anything in, after you have a chance to look at this --

2  A    Uh-huh.

3  Q    -- please.  Any language in this email that would signal

4  to you, one way or the other, whether the vehicle, the Cobra,

5  has been titled or not?

6  A    No, absolutely nothing.

7  Q    What about anything in this email that would signify to

8  you whether or not there's a prior lien on the Cobra or not?

9  A    Nothing.

10 Q    You see at the bottom here, I see there's kind of, what in

11 my mind, looks like maybe a separate kind of discussion about

12 doing other transactions down the road on the Shelby

13 Superformance vehicles.  Is that a fair characterization of how

14 you read this?

15       MR. CONRARDY:  Objection.  Leading the witness.

16       MR. GIBBS:  I'll restate, Your Honor.

17       THE COURT:  Rephrase please.

18       MR. GIBBS:  Yes, Your Honor.  Yes.  And I apologize.

19       THE COURT:  Don't apologize, just rephrase.

20       MR. GIBBS:  Yes.

21 BY MR. GIBBS:

22 Q    Mr. Mosing, looking at the last few paragraphs of this

23 email from Trace, Mr. Stephenson, what is -- what are the -- in

24 your mind, is going on here?  It looks like some sort of a

25 proposal, but you tell us.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Mosing - Cross                          46

1   A    Basically, I mean, I -- the car having a presence in my

2   dealership, if anybody had any interest in it, that I could

3   forward any interested parties to Trace because he was

4   currently the dealer for Superformance in Texas.

5   Q    And at the very bottom, not the last line but the second

6   to last line, "There is also money to be made on the buildout

7   of the new cars."  Do you see that paragraph, Mr. Mosing?

8   A    Yes.

9   Q    What is happening in this paragraph?

10  A    So as I said it before, the -- these particular cars are

11  shipped without any powertrain in them.  A lot of people who

12  would like to purchase these cars don't have any interest in

13  putting the engines and transmissions in themselves.  So as

14  a -- as an auxiliary kind of service, you could sell the car to

15  an individual and then also offer to install an engine and

16  transmission at an additional cost to complete the car, so that

17  they would have a complete car instead of just a rolling

18  chassis.

19  Q    Fair enough.  Thank you, Mr. Mosing.

20  A    Uh-huh.

21  Q    So, and again, the date on this email is what again?

22  A    April 19th, 2012.

23  Q    Thank you.  Okay, let's fast forward.  And this is the

24  agreement you were questioned about earlier by Mr. Conrardy,

25  and so this is the agreement that's the subject of this car,

Mosing - Cross                                    47

1  right?  The Shelby?  The Cobra?

2  A     Yes.

3  Q     And what's the date on this agreement?

4  A     May 8th of 2012.

5  Q     May 8th, 2012, so approximately -- less than a month after

6  the email that we just looked at, correct?

7  A     Yes.

8  Q     As Exhibit 2.  Yes?

9  A     Uh-huh, yes.

10 Q     And we just talked about the proposal that Mr. Stephenson

11 sent on April 17th.  Between that email, Mr. Mosing, and this

12 agreement, were there any discussions between you and

13 Mr. Stephenson?

14 A     The day that we were signing this, we had -- we were just

15 talking about the details of it.

16 Q     No discussions between the email in Exhibit 2 and this

17 agreement about changing the structure of the deal?

18         MR. CONRARDY:  Objection.  Leading the witness.

19         THE COURT:  Yeah, it was.  But I'll allow the

20 question.

21 BY MR. GIBBS:

22 Q     Do you need me to rephrase, Mr. Mosing?

23 A     Can you repeat the question?

24 Q     Sure.  Were there any discussions between the email in

25 Exhibit 2 sent on April 19, 2021, and this agreement dated

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

Mosing - Cross                                      48

1  May 8th -- sorry, April 19th, 2012, and May 8th, 2012 about

2  changing the terms of the proposal?

3  A    No.

4  Q    And looking at this agreement, Mr. Mosing, just looking at

5  it, are there any changes in terms from what Mr. Stephenson

6  propose to you on April the 17th?

7          MR. CONRARDY:  Objection.  Leading the witness.

8          THE COURT:  Sustained.  Counsel, if he can answer

9  with a yes or no, it's leading.  So just rephrase, please.

10         MR. GIBBS:  Sure, yes, Your Honor.

11 BY MR. GIBBS:

12 Q    So, Mr. Mosing, looking at this agreement and the email

13 that we just looked at as Exhibit 2 -- and I can pull it up if

14 you'd like me to -- what are the differences in the terms, as

15 far as you can tell?

16 A    There was no, there was no change in the terms that were

17 presented to me.

18 Q    Do you see the word "loan" anywhere on this agreement?

19 A    No.

20 Q    What about the word "borrow"?

21 A    No.

22 Q    Mr. Mosing, what were the discussions about the title of

23 this Cobra at this time?

24 A    The day that -- the day that Trace came in to sign the

25 document and pick up the check, I asked him point blank, you

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Mosing - Cross                            49

 1  know, if there was any title.  He said no.  He said  --

 2              MR. CONRARDY:  Objection.  Hearsay.

 3              MR. GIBBS:  The debtor's not a party in this case.

 4              THE COURT:  Well, the trustee stands in the shoes of

 5  the debtor, so in essence, he is the party.

 6              MR. GIBBS:  Also stands in the shoes of a

 7  hypothetical creditor.

 8              THE COURT:  You wear a lot of shoes.

 9              MR. GIBBS:  Yeah, you like shoes, and different hats

10  too.

11              MR. CONRARDY:  Your Honor, it's a statement against

12  interest.  It's an admission by party opponent.

13              THE COURT:  Yeah, that's what he's, that's what he's

14  arguing about is that he does represent the -- or he isn't the

15  debtor.  He is not the party opponent is his argument.  I'm

16  going to overrule that.  I'm going to allow the testimony.

17  BY MR. GIBBS:

18  Q    Go ahead, Mr. Mosing.

19  A    I mean, as a -- as a general transaction, it's normal to

20  ask if there's any title to the car, and he said, no, you just

21  need the MSO.

22  Q    Any other discussions about the title?

23  A    No, that was it.  That was the end of it.

24  Q    And was there any discussions about a lien on the car?

25  A    No.

Mosing - Cross                          50

1  Q    On the Cobra.  So looking at this agreement, Mr. Mosing,

2  what would have happened had, for instance, Mr. Stephenson came

3  back to you during this one-year period between May 8th, 2012

4  and May 8th -- May 9th, 2013, if he had come back to you and

5  paid money according to this agreement?  What would have

6  happened?

7           MR. CONRARDY:  I'm going to object on speculation.

8           MR. GIBBS:  Your Honor, we have a clear agreement.

9           THE COURT:  Let the question go out first, and then

10  raise your objection.  Rephrase -- repeat the question again,

11  please.

12  BY MR. GIBBS:

13  Q    Mr. Mosing, looking at this agreement and you know, the

14  discussion of the terms, what would have -- if Mr. Stephenson

15  came back and paid you, if you look at this agreement, looks

16  like between May 9th, 2012 and November 9th, 2012, he had an

17  opportunity to pay you $130,000.  What if he had done that?

18  A    That would have been fine with me.  I would have returned

19  the car and the MSO to him.

20  Q    And then the disagreement would have been over?

21  A    Correct.

22  Q    Okay.  And let's talk about the other situation, which is

23  what actually happened.  What happens if he doesn't come back

24  to you and pay you $150,000 by May 9th, 2013?  What's your

25  understanding of what happens then?

Mosing - Cross                                51

1   A    The agreement that we had was that if he wasn't going to

2   repurchase the car back within that one-year timeframe, then I

3   was going to be the permanent owner.

4   Q    You own it, right?

5   A    Yeah.

6   Q    And that's your understanding of this agreement?

7   A    Correct.

8   Q    Which is signed by both you and Mr. Stephenson, correct?

9   A    Yes.

10  Q    Do you have any other agreements regarding this Cobra?

11  A    No.

12  Q    Would you have done this deal if you had known there was a

13  title with a lien noted on it?

14          MR. CONRARDY:  Objection.  Speculation.

15          MR. GIBBS:  Your Honor, it goes to the elements of

16  fraud, it's --

17          THE COURT:  Overruled.

18  BY MR. GIBBS:

19  Q    Was that a no, Mr. Mosing?

20  A    I would absolutely not have entered into this deal if

21  there was a lien on a title.  I mean, if he would have

22  presented me with a clear title, then we're -- you know, we

23  would be able to carry out the transaction.  But I had no

24  knowledge of any title existing at all.

25  Q    And why wouldn't you have done that, Mr. Mosing?  Why

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

Mosing - Cross                                    52

1   wouldn't you have done the deal if there was a lien on it?

2   A    Because it's already owed to somebody else.  It's just,

3   it's not -- it wouldn't be -- it wouldn't be prudent.

4   Q    Thank you, Mr. Mosing.  And how was the Cobra delivered to

5   you?

6   A    Trace brought it in an enclosed trailer from his shop

7   in -- I believe it was in Marble Falls.

8   Q    And it was in an enclosed trailer, so it wasn't driven to

9   your dealership, correct?

10  A    Correct, uh-huh.

11  Q    And do you recall how many miles the Cobra had when it was

12  delivered?

13  A    I believe it's around a little over 300, somewhere around

14  there, 350 maybe.

15  Q    What about license plates?  Did it have any plates?

16  A    No plates.

17  Q    Is all that in your, you know, in your professional -- is

18  that typical in this type of transaction for the vehicle not to

19  have a license plate?

20        MR. CONRARDY:  Objection.  Not -- are you asking for

21  an expert opinion?

22        MR. GIBBS:  He's a car dealer, so I'm just asking as

23  a car dealer.

24        MR. CONRARDY:  Well, but he has -- he has not been

25  qualified to talk about what are typical transactions in Texas

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Mosing - Cross                              53

1   for --

2             MR. GIBBS:  Did he not just testify that he sold

3   100 --

4             THE COURT:  He asked about him personally, what he

5   does.  He's not testifying as an industry.

6             MR. CONRARDY:  Maybe I missed that nuance in the

7   question.

8             MR. GIBBS:  Well, I wasn't --

9   BY MR. GIBBS:

10  Q    I'm just asking about in your experience, Mr. Mosing.

11  A    When you're going from dealer to dealer, it could be

12  typical to take delivery of a car that's not registered or

13  titled.

14  Q    Thank you.  And what have you done, Mr. Mosing, since

15  2013 -- have you done -- no, what have you done, I guess, since

16  2013 to preserve or maintain the Cobra?

17  A    I've carried two levels of insurance on it.  We did -- we

18  had to do some maintenance on it.  The fuel -- the way that the

19  fuel tank's designed, it has an aluminum skin with a rubber

20  bladder inside.  The bladder fails after about seven years, and

21  this particular one failed, and so we had to rebuild the fuel

22  cell at a cost of about $2,000 to do that.  And then just

23  keeping it in acclimatized secured storage with surveillance

24  and video, and everything.

25  Q    Thank you.  There was discussion earlier, and we talked

Mosing - Cross                                54

1  about the manufacturer's statement of origin, the MSO.  Can you

2  briefly tell the Court, you know, what is an MSO?

3  A    You can kind of think of an MSO as, like, a birth

4  certificate for a vehicle, and typically, dealers would turn

5  that into the DMV to obtain a title in whichever individual's

6  name that's purchasing the car.

7  Q    And when an individual goes to a dealer, do they typically

8  obtain an MSO?

9  A    The car could be sold just under the MSO, and it's

10 actually, in some cases, a little bit more attractive for the

11 purchaser.  The only downside to that is that if they're not a

12 dealer, then they can't register the vehicle until it gets

13 titled.

14 Q    There was some discussion earlier about notations, and let

15 me just -- actually, that's okay.  There was a discussion

16 earlier about notations on the MSO for titles or liens.  Would

17 you expect to see those sorts of notations on an MSO?

18 A    No.

19 Q    And why not?

20 A    Because it's -- it's the original document that goes with

21 the car, so there's no ownership, per se, specified on the MSO.

22 Q    After the May 9th, 2013 date passed, why didn't you take

23 any steps to have the car titled?

24 A    Again, if, if, if at some point that I did decide to sell

25 the car, it's, it's a, it's a stronger selling point to the

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Mosing - Cross                          55

1  individual who's purchasing it, just to purchase it under the

2  MSO.  When that exchange takes place, there's no taxable event

3  from the DMV.

4  Q    So with that, does that make the car more marketable if it

5  has an MSO?

6  A    As opposed to one that's just under title, I would believe

7  so, yes.

8  Q    And there was also some discussion earlier about whether

9  or not you took any action to foreclose on a loan.  Why didn't

10 you, why didn't you take any action, Mr. Mosing, after

11 May 9th, 2013?

12 A    Because according to our agreement that we had, I was -- I

13 had permanent ownership in the car, and there was no reason to

14 question that it was going to be any different.

15 Q    Mr. Mosing, I'm pulling up Trustee Plaintiff's Exhibit 4,

16 and we discussed the notation at the bottom of the check.  Can

17 you tell the Court a little bit about your reasoning behind

18 notating the way you did on this draft?

19 A    With all the different, I mean, things that I have going

20 on, it's just a personal reference for myself that -- what I

21 had, you know, wrote the check for.  But, I mean, it's a memo

22 field.  It's not -- it's not really -- it's not really what --

23 you know, I mean, you could put anything in a memo field.  I

24 could have left it completely blank.  So it's not necessarily

25 what would dictate what the transaction actually was.

1  Q    Any other reason to notate it this way, as opposed to just

2  saying, for purchase of Cobra?

3  A    I could have put anything, I mean, yeah.  I could have put

4  that, I could have put -- you know, it's a memo field.  And

5  it's -- I'm the only one that's writing the checks, so -- out

6  of my own account.

7  Q    We also -- we looked at a letter, I think it was dated

8  June 5th, 2019, of course, seven years after the agreement.

9  What's the significant of that letter, in your mind, that you

10 signed, I guess on -- or that Mr. Winterrowd signed on your

11 behalf?  I mean, does that mean anything to you?

12           THE COURT:  Are you referring to Exhibit 5?

13           MR. GIBBS:  I believe I am, Your Honor.

14           THE COURT:  I just want to make sure the reference is

15 clear for the record.

16           MR. GIBBS:  Yes, sir.

17 BY MR. GIBBS:

18 Q    I guess, Mr. Mosing, what I'm really asking is this,

19 what -- you know, there's been a lot of discussion during this

20 course of this lawsuit, and in all fairness, perhaps some

21 contradictory, you know, arguably contradictory notation, since

22 2012.  Of course, after 2013, when the agreement expired -- can

23 you just tell the Court, from your perspective, does it matter?

24           MR. CONRARDY:  Objection.  That's definitely leading.

25 It's a yes or no question.  It kind of goes to the heart of

Mosing - Redirect                                    57

1   what's going on here, too.

2          MR. GIBBS:  Let me rephrase.

3          THE COURT:  Rephrase, please.  Thank you.

4   BY MR. GIBBS:

5   Q    Mr. Mosing, in your mind, what was going to be the

6   practical -- or excuse me, rephrase.

7        What was -- what is the effect of Mr. Stephenson not

8   paying you back by May 9th, 2013?

9   A    At that point, within that one-year period that he had

10  first right of refusal to purchase the car back, once the

11  agreement had expired, then that's pretty much the end of story

12  and I had any and all rights to sell the car, keep the car, do

13  whatever I wanted with it.

14  Q    Thank you, Mr. Mosing.

15         MR. GIBBS:  That's all the questions I have for now.

16         THE WITNESS:  Thank you.

17         THE COURT:  Mr. Conrardy, redirect?

18         MR. CONRARDY:  Yes.  Thank you.  I'm going to turn

19  the lectern.  I feel more comfortable over here.

20         THE COURT:  That's fine.

21         MR. CONRARDY:  Please bear with me.

22         THE COURT:  It works.

23         MR. CONRARDY:  Yeah.  All right.

24                    REDIRECT EXAMINATION

25  BY MR. CONRARDY:

Mosing - Redirect                    58

1   Q    So there was some discussion in your testimony about this

2   GT -- is it GT40 from South Africa?

3   A    Yes.

4   Q    Okay.  And you had testified that it was an incomplete

5   vehicle.  Is that right?

6   A    Correct.

7   Q    And as a result, there was no certificate of title, right?

8   A    Correct.

9   Q    Okay.  The vehicle we're talking about here, was it a

10  complete car or an incomplete car when you received it?

11  A    It's complete.

12  Q    Okay.  And so because it was complete, it's conceivable

13  there was -- there could have been a title issue on it, right?

14  A    Could or could not, yes.

15  Q    And the transaction between you and Mr. Stephenson wasn't

16  a dealer-to-dealer transaction, right?

17  A    That's correct.

18  Q    Okay.

19        MR. CONRARDY:  Everybody gets to see my desktop.

20        THE COURT:  You weren't going to be able to escape

21  that easily from the box.

22        MR. CONRARDY:  If you want to refill your waters, we

23  can do that.

24        THE WITNESS:  Yeah, that's what I was --

25        MR. CONRARDY:  Okay.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Mosing - Redirect                    59

 1              THE WITNESS:  Yeah, I just didn't --

 2              MR. CONRARDY:  It looks like I lost my signal for

 3  the --

 4              THE COURT:  Oh, there it goes.

 5              MR. CONRARDY:  Oh, there it -- now, it's online.

 6  Okay.

 7  BY MR. CONRARDY:

 8  Q    Let me know when you're ready.  I've just got a few more

 9  questions.

10  A    Okay.  I'm ready.

11  Q    So -- oops, still kind of getting used to this.  All

12  right.  So in the agreement, you had -- you just testified that

13  it was your understanding that if $150,000 wasn't paid by May

14  9th, 2013, or, you know, any of the other kind of payment

15  tiers, that you'd become the permanent owner of the Cobra.  So

16  where in this agreement does it say you'd become the permanent

17  owner?  Does it say anywhere that you'd become the permanent

18  owner?

19  A    When it says agreement that Trace Stephenson may

20  reacquire, so the ownership would be mine from May 8th, 2012.

21  Q    So that's your understanding.

22  A    Correct.

23  Q    Because there really aren't any specific instructions in

24  here or a description of what would happen if the payment was

25  made, other than that -- I suppose, that one line.  Is that

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

1  correct?

2  A    The way that the agreement was written and understood by

3  both of us was if there was no transaction of money going from

4  Trace back to me, then I would continue to own the car.

5  Q    You had mentioned that first right of refusal.  I don't

6  see any first right of refusal language in here.  Or am I

7  missing something?

8  A    No.  That's just trying to explain that on the email that

9  we had an exchange of, he requested that I didn't advertise to

10  sell the vehicle because within that one-year period, he wanted

11  to have the opportunity, if he were to be able to come up with

12  the funds, to purchase the car back, that I would sell him the

13  car back.

14  Q    Okay.

15  A    That was in the email.  I guess it was -- I don't remember

16  which exhibit number.

17  Q    Okay.  All right.

18

19        MR. CONRARDY:  So I have no further questions for

20  him, unless you guys are -- do you have a few more questions?

21        MR. GIBBS:  I just have a few followup, Your Honor.

22        THE COURT:  Okay.

23        MR. CONRARDY:  And I guess I reserve a right to ask

24  additional followups, since it's -- we're hearing both cases at

25  the same time.

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page61 of 122

61

 1              THE COURT:  Well, we're going to be bouncing back and

 2     forth until you guys are tired.

 3              MR. CONRARDY:  Okay.  All right.

 4              THE COURT:  Or at least until I'm sick of you guys.

 5              MR. CONRARDY:  All right.  Fair enough.

 6              THE COURT:  All right.  Mr. Gibbs.

 7              MR. GIBBS:  Your Honor, actually, I think I do not

 8     have any more -- no more questions for this witness, Your

 9     Honor.

10              THE COURT:  All right.  Thank you.

11              In that case, you're done, Mr. Conrardy.

12         (Witness excused)

13              MR. CONRARDY:  Thank you, Your Honor.  So just like

14     kind of a housekeeping thing, I was going to call

15     Mr. Stephenson next, but he says he has to go fill his meter.

16              THE COURT:  Oh, we're going to take a break right

17     now.

18              MR. CONRARDY:  Oh, perfect.  Perfect.

19              THE COURT:  So it's -- so I cannot be hurt by my

20     staff here.  We're going to take a 15-minute break, and then

21     come back, and we'll take Mr. Stephenson.

22              MR. CONRARDY:  Okay, thank you, Your Honor.

23              THE COURT:  All right.

24              THE CLERK:  All rise.

25         (Recess taken at 10:58 a.m.)

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                    62

 1      (Proceedings resumed at 11:21 a.m.)

 2          THE COURT:  All right, Mr. Conrardy, your next

 3  witness.

 4          MR. CONRARDY:  Okay.  The trustee calls Mr. Tracy

 5  Stephenson.

 6          THE COURT:  Thank you.

 7          THE CLERK:  Would you please raise your right hand,

 8  sir.

 9          TRACY STEPHENSON, PLAINTIFF'S WITNESS, SWORN

10          MR. CONRARDY:  I'm just waiting for this monitor to

11  kick in, Mr. Stephenson, and then I'll start asking you some

12  questions.  There we go.

13                  DIRECT EXAMINATION

14  BY MR. CONRARDY:

15  Q    All right, Mr. Stephenson, please state your name for the

16  record.

17  A    Tracy Stephenson.

18  Q    And you're the debtor in the related bankruptcy case,

19  correct?

20  A    Yes.

21  Q    Okay.  And can you tell us just a little bit about your

22  background.  Where are you originally from?

23  A    I grew up in Colorado, and spent most of my time in

24  Colorado but have lived in Texas a few separate times.

25  Q    Okay.  Can you tell us about those few times that you've

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                                    63

1  moved to Texas?

2  A    In about 2008, I moved down to Texas initially, came back

3  in 2014, and then went back two other times for short periods

4  of time.

5  Q    Okay.  And then when did you move back to Colorado for

6  your kind of current stint here?

7  A    This current stint, last June.

8  Q    Last June.  Okay.  So just -- I just want to make sure I

9  understand the timeline.  So you were in -- you lived in Texas

10 from about 2008 to 2014.  Is that right?

11 A    Yes.

12 Q    Okay.  And then after 2014, when exactly did you move to

13 Colorado?

14 A    In about 2014, I moved from Texas to Colorado.

15 Q    Okay.  Okay, thank you.  And then tell us a little bit

16 about your involvement in the automobile industry?

17 A    I've always been a car guy.  Bought and sold cars,

18 collected them, and I became a distributor for the

19 Superformance cars in 2006, and maintained a relationship with

20 them through about 2012 or '13.

21 Q    Okay.  In which states did you distribute Superformance

22 cars?

23 A    Initially in Colorado, and then ultimately in Texas also.

24 Q    Okay.  And are you a licensed automobile dealer in either

25 of those states?

Stephenson - Direct                              64

1   A      No.

2   Q      Have you ever been?

3   A      No.

4   Q      And can you tell us, what's a Legendary Motor Sport?

5   A      That was the name of my initial dealership, or

6   distributorship for these cars in Colorado.

7   Q      Well, so can you tell us, what's the difference between a

8   dealership and a distributorship?

9   A      These cars are considered component cars.  They're

10  basically, really nice, well-done parts, that are sold as, as

11  Jeff testified, in two separate transactions.  There's a

12  rolling chassis.  You do not need a dealership license for

13  that, so basically, they're selling components.  So a

14  distributorship would relate to the selling of these

15  components.

16  Q     Okay.  So since you didn't have a dealership license, you

17  only sold component cars.  Is that right?

18  A      Correct.

19  Q      Okay.  And what's the status of Legendary Motor Sport?

20  A      I dissolved that.  It was no longer active in about 2012

21  or '13.

22  Q      Okay.  And then tell us a little bit about 427 Legends.

23  A      When I got the dealership in Texas, I rebranded for that

24  market to 427 Legends.

25  Q      Okay.  Did either Legendary Motor Sport or 427 Legends

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                    65

1  have physical locations?

2  A    Yes, both.

3  Q    And where were those locations?

4  A    Legendary Motor Sport was located in Castle Rock,

5  Colorado.  And then 427 Legends was located in Marble Falls,

6  Texas.

7  Q    And then where in relation to Austin is Marble Falls?

8  A    It's approximately 45 minutes northwest.

9  Q    Okay.  So let's back up a little bit and tell us a little

10 bit about how you initially met Mr. Mosing.

11 A    He called me regarding the purchase of a potential car for

12 himself that was -- ended up being a Superformance GT40.  He

13 expressed interest.  I ordered him one, and it took a while to

14 be delivered, but ultimately, he did purchase that first car.

15 Q    Okay.  And that was the component car that Mr. Mosing

16 testified about --

17 A    Yes.

18 Q    -- from South Africa?

19 A    Correct.

20 Q    Okay.  Okay.  So this is what's been admitted as

21 Exhibit 1, and I'll just kind of scroll through this.  And like

22 I mentioned to Mr. Mosing, on any of these exhibits, if you

23 need me to move up or down, or go to other pages, just let me

24 know, okay?

25 A    Okay.



Stephenson - Direct                                66

1  Q     Do you recognize this?

2  A     Yes.

3  Q     And what is this?

4  A     The title for the Shelby Cobra, serial number CSX4501.

5  Q     All right.  So that's the car that we're talking about

6  today.

7  A     Correct.

8  Q     And let's just see here.  So it says owner, Stephenson

9  Track D.  who is that?

10 A     That's myself.

11 Q     Okay.  And then on here, it says date purchased, December

12 20th, 2011.  Can you tell us about how you came about to

13 purchase this vehicle?

14 A     It was through a dealership in Dallas, Texas.

15 Q     What was the name of the dealership?

16 A     Sanderson Sales and Marketing.

17 Q     Okay.  And when you purchased it, was it a complete or

18 incomplete car at the time?

19 A     It was in incomplete car.

20 Q     Okay.  And then what did you do to make it a complete car?

21 A     Through that relationship with that dealer, chose the

22 power train, which was installed by a company.

23 Q     Okay.  And how did you purchase the car -- I'm sorry.  Did

24 you pay cash or did you finance the purchase?

25 A     It was not financed.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                        67

1    Q    All right.  So you paid cash?

2    A    In one form or another, I believe, yes.

3    Q    And do you recall how much you paid?

4    A    I do not recall the specific amount.

5    Q    Okay.  And when you purchased the car from Sanderson, was

6    an MSO delivered with it?

7    A    Yes.

8    Q    Okay.  And when did you apply to the Colorado DMV for this

9    certificate of title?

10   A    I don't -- I can only just go off the dates on the title.

11   Q    All right.  So it says date accepted, March 8th, 2012.  Do

12   you think it's fair that you applied around that time?

13   A    I believe so, yes.

14   Q    Okay.  And when you applied for the title, what documents

15   did you present to the Colorado DMV?

16   A    It would have been the MSO and the paperwork for the

17   transaction, for both the chassis and the components.

18   Q    Okay.  So let's see, let's go to this MSO.  So what's been

19   admitted as Exhibit 7, an MSO, is this the -- a copy of the MSO

20   that you presented to the Colorado DMV?

21   A    I believe so.

22   Q    Okay.  And when you presented the MSO to the DMV, what did

23   the DMV do with that MSO?

24   A    I don't recall that specific --

25   Q    Did the DMV return the original MSO to you?

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Stephenson - Direct                              68

1  A     Yes.

2  Q     Okay.  So we only have a copy of the front of the MSO.

3  What's on the back of the MSO?

4  A     It'd be the assignment from the dealership to me, the

5  purchaser.

6  Q     Okay.  Were there any other -- and what is the assignment

7  look like?

8  A     Similar to the back of a title.

9  Q     Okay.  So it's like handwritten?

10 A     The information about the dealer and the purchaser is

11 handwritten, yes.

12 Q     Okay.  And are you familiar if Mr. Mosing -- or did you,

13 when you provided the MSO to Mr. Mosing, did you make any

14 endorsements on the back of it?

15 A     No, I don't believe so.

16 Q     Okay.  Are you aware of any endorsements on the back that

17 reference Mr. Mosing?

18 A     No.

19 Q     Okay.  I'm going to go back to Exhibit 1.  So why did you

20 title the vehicle in Colorado?

21 A     I was more familiar with the process in Colorado, having

22 done other vehicles there throughout my life.

23 Q     Okay.  And then, on the title where it says first lien

24 holder, there's a note that says Extraco Bank, and it says

25 amount of lien, $75,000.  Can you tell us about that lien?

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                69

1  A    The lien amount of is stated at 75.  I had a promissory

2  note with the bank that fluctuated -- the total amount

3  fluctuated over time.  There was three or four different assets

4  that were secured with that note.  One being the Cobra, and two

5  or three other lots, vacant lots that I owned down in Texas.

6  Q    Okay.  And then when Extraco put its lien on the title,

7  who had possession of the title?

8  A    Extraco Bank had possession of the title.

9  Q    Okay.  And so you'll see here on the top right corner, it

10 says signature below certifies under penalty of perjury in the

11 second degree, the release of the first lien holders interest

12 in the bank, and it says lien holders name, Extraco Bank, and

13 A, and then the signature looks like it says Sherry Mitchell

14 (phonetic) and it's dated June 2nd, 2016.  Did I read that

15 correctly?

16 A    Yes.

17 Q    And so tell us why did Extraco release its lien on the

18 title?

19 A    I had ultimately paid off the note.

20 Q    Okay.  And it's -- the release is dated June 2nd, 2016.

21 About when did you pay off the note?

22 A    Shortly before that.

23 Q    Okay.  And then after you paid off the note, when did

24 you -- did you receive the original title back from the bank?

25 A    Yes.

Stephenson - Direct                    70

1  Q     And about when was that?

2  A     Shortly thereafter, within 30 to 60 days.

3  Q     Okay.  And did you have possession of the original

4  certificate of title until you turned it over to Mr. Peters?

5  A     Yes.

6  Q     All right.  So let's, well, let's kind of go back in time

7  a little bit, and let's talk about your -- the transaction that

8  we're all here about today.  So I'm going to pull up Exhibit 3,

9  which is the agreement.  Can you just give us a brief

10 background, actually, you know what, let's start with, let's

11 start with this email.  So Exhibit 2 is this April 19th email.

12 Do you recognize this?

13 A     Yes.

14 Q     Okay.  And it says it's from CSXnut@yahoo.com.  Who is

15 that?

16 A     That's my email account.

17 Q     Okay.  And then it says twocajunairmen@yahoo.com.  Who's

18 that?

19 A     That's Jeff Mosing.

20 Q     Okay.  And what's the date of this?

21 A     April 19th of 2012.

22 Q     All right.  So just tell us about kind of why you sent

23 this email to Mr. Mosing.

24 A     For a couple reasons.  I needed cash, well, one being the

25 business that I was trying to operate, and in the note that I

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                                          71

1   had with Extraco, was an annual maturing note, so I was looking

2   to buy down that as a part of their terms, to extend the note.

3   Q    Okay.  So tell us about -- you mentioned a business, can

4   you tell us a little more about the business that you wanted

5   the money for.

6   A    There was a -- I've always been in construction, so there

7   was a construction opportunity that I was working on.

8   Q    Okay.  And then you also mentioned that it was your intent

9   to pay down the Extraco note.  What happened with that?

10  A    Ultimately, they changed their terms.  The bank executive

11  that I had dealt with in acquiring the note, we had, we had an

12  agreement on how much each asset would need to be paid -- would

13  need to be bought down by to release each asset.  So we had a

14  fixed amount for the lots and again, and also the Cobra.

15  Q    Okay.  So the $120,000 that Mr. Mosing loaned to you, how

16  much of that did you use to pay down the Extraco note?

17  A    It ended up being nothing.  And the reason why is the bank

18  executive that I had the terms -- that I had the agreement

19  with, was no longer with the company and the replacement

20  executive that I dealt with, he wanted the entire note paid

21  off, which I couldn't do at the time.

22  Q    And why couldn't you do it at the time?

23  A    It just wasn't feasible with the amount of capital that I

24  had.

25  Q    Okay.  So it says, and we're looking at Exhibit 2, it says

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                                72

 1  purchase price -- this is part of your proposal.  Purchase

 2  price of 120,000 with an agreement that I can purchase the

 3  Cobra back for up to one year.  So why did you use the phrase

 4  purchase instead of loan?

 5  A    It was, it was just the initial reach out to test his

 6  interest in purchasing the car.

 7  Q    And then when you wrote this email, did you have

 8  possession of the certificate of title at that time?

 9  A    No.

10  Q    And what discussions did you have with Mr. Mosing

11  regarding the title?

12  A    I don't recall specific discussions related to the title.

13  Q    Okay.  One thing, Mr. Mosing had testified that you had

14  told him with respect to the title, you said no, you just need

15  the MSO.  Did you make that statement?

16  A    No.

17  Q    Okay.  What discussions do you recall happening with

18  Mr. Mosing regarding the title?

19          MR. GIBBS:  Objection.  Asked and answered.

20          THE COURT:  Overruled.

21          THE WITNESS:  I don't recall specific discussions

22  related to the title.

23  BY MR. CONRARDY:

24  Q    Okay.  Were there -- what discussions were there about any

25  liens on the car?

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Stephenson - Direct                                    73

1   A    I don't recall specifically discussing that.

2   Q    Okay.  Do you recall Mr. Mosing ever asking you whether

3   there were liens on the car?

4   A    I don't recall.

5   Q    Okay.  Do you recall whether Mr. Mosing asked you if you

6   had the original title?

7   A    No, I don't recall.

8   Q    And so we're looking at Exhibit 1 -- actually, let's go to

9   the actual agreement.  So there are these kind of reacquisition

10  amounts, so the 130,000, 140,000, 150,000.  Do you see that on

11  Exhibit 1?

12  A    I do.

13  Q    So what payments did you make to Mr. Mosing on account of

14  this agreement?

15  A    I did not make any payments to Mr. Mosing on this

16  agreement.

17  Q    And why didn't you make any payments?

18  A    There -- the intent was not to make payments.  It was to

19  pay it off, and ultimately, I couldn't financially make that

20  happen, so I did not make any payments.

21  Q    Okay.  Was it your intent to pay it off?

22  A    Yes, absolutely.

23  Q    All right.  So you -- do you recognize this,

24  Mr. Stephenson?

25  A    Yes.



Stephenson - Direct                         74

1  Q    All right.  And what's this?

2  A    Top left is the check that I received from Mr. Mosing.

3  Q    Okay.  And it's made out to 427 Legends.  Why was it made

4  to that?  427 Legends instead of you.

5  A    I don't recall.

6  Q    Okay.

7  A    I don't recall why.

8  Q    Who were -- at the time of this transaction, who were the

9  members or shareholders of 427 Legends?

10  A    I was the sole member.

11  Q    Okay.  And then there's this, in the memo line, which you

12  know, I'm sure you've seen us talk about this, it says one year

13  capital loan.  Do you, you know, what input do you have on why

14  that was put on there?

15          MR. GIBBS:  Objection.  Calls for speculation.

16          MR. CONRARDY:  I'll rephrase the question.

17  BY MR. CONRARDY:

18  Q    Do you personally know why that memo line was written on

19  there?

20  A    I do not.

21  Q    Okay.  Was it your idea to put that memo line in there?

22  A    No, it was not.

23  Q    Okay.  What demands did Mr. Mosing make upon you for the

24  certificate of title?

25  A    None.



Stephenson - Direct                              75

1  Q    Okay.  What demands did Mr. Mosing make for you to repay

2  the money?

3  A    None.

4  Q    Okay.  And has Mr. Mosing or any of his affiliates that

5  you know sued you?

6  A    No.

7  Q    Okay.  And when you received the original title back from

8  Extraco Bank, why didn't you deliver it to Mr. Mosing?

9  A    I don't have a specific answer to that.  We hadn't talked

10  in years.

11  Q    Okay.

12        MR. CONRARDY:  Your Honor, just give me about two

13  minutes to go over my notes.

14        THE COURT:  Sure.

15        MR. CONRARDY:  Almost done with this.  I have no

16  further questions for Mr. Stephenson, save for redirect or

17  rebuttal.

18        THE COURT:  I understand.

19        MR. CONRARDY:  Whatever we're calling it.

20        THE COURT:  I understand.

21        MR. CONRARDY:  Okay.  Thank you.

22        THE COURT:  All right, Mr. Martin?  Whenever you're

23  ready.

24        MR. MARTIN:  Thank you.

25        MR. CONRARDY:  Let me get out of the way.

ACCESS TRANSCRIPTS, LLC            1-855-USE-ACCESS (873-2223)

Stephenson - Cross                                76

1                    CROSS-EXAMINATION

2  BY MR. MARTIN:

3  Q    Good morning, Mr. Stephenson.  My name is Jarrod Martin.

4  I'm the attorney for Mr. Mosing.  We haven't met before, right?

5  A    Correct.

6  Q    Okay.  Now, it's true you started buying and collecting

7  Shelby cars and replicas around 2001.  Is that right?

8  A    Yes.

9  Q    And am I right that in 2006, give or take, you started

10  Legendary Motor Sport?

11  A    Yes.

12  Q    Okay.  And this company focused primarily on

13  selling/brokering, super performance replicas, correct?

14  A    Yes.

15  Q    And 427 Legends, did that also buy and sell replicas and

16  super performance vehicles?

17  A    Yes.

18  Q    Okay.  So based on your previous experience, it's fair to

19  say you're experienced and knowledgeable in replica sports

20  cars.

21  A    Yes.

22  Q    Including replica Shelby sports cars like the ones at

23  issue in this case.

24  A    Yes.

25  Q    I want to show you a brief kind of demonstrative, a --

Stephenson - Cross                                77

1   does this match your recollection of the, of the Cobra issue in

2   this case?

3           THE COURT:  I don't mean to interrupt, Mr. Martin, is

4   there any way you can put it on the easel?

5           MR. MARTIN:  Yeah, sure.

6           THE COURT:  All right.  Thank you.

7   BY MR. MARTIN:

8   Q    Is that the vehicle at issue in this case?

9   A    I can't say if it is for certain or not.

10  Q    Does it look similar to the vehicle?

11  A    Yes, it looks similar, yes.

12  Q    And when selling and brokering replica sports cars, is it

13  fair to say that some transactions involve just an MSO?

14  A    Yes.  The -- yes.

15  Q    And some transactions involve a title, correct?

16  A    Correct.

17  Q    And in your dealings with Mr. Mosing, some transactions

18  had just an MSO, correct?

19  A    Correct.

20  Q    And some transactions had a title, correct?

21  A    Correct.

22  Q    And before the transaction issue in this case, am I right,

23  I remember there were about four transactions total buying

24  vehicles from you by Mr. Mosing?

25  A    To my recollection, yes.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

Stephenson - Cross                           78

1  Q    Okay.  And you first met Jeff around 2009, 2011 time

2  period, correct?

3  A    Correct.

4  Q    And you had a business relationship in this buying and

5  selling of vehicles, correct?

6  A    Yes.

7  Q    And you also had a personal relationship, right?

8  Mr. Mosing testified you'd gone out to lunch.

9  A    Yes.

10 Q    Do you recall how many times you met up socially?

11 A    I do not.

12 Q    Okay.  You purchased the '65 Shelby back in 2011, correct?

13 A    I believe so, yes.

14 Q    And you titled the Shelby in 2012.  Is that right?

15 A    I believe so, yes.

16 Q    Okay.  And did you title it at the request of Extraco

17 Bank?

18 A    I don't recall specifically why.

19 Q    But Extraco Bank would have required a title in order

20 to --

21         MR. CONRARDY:  Objection.  Hearsay.

22         THE COURT:  Sustained.

23         MR. MARTIN:  I'll rephrase the question.

24 BY MR. MARTIN:

25 Q    You sent the title to Extraco Bank, correct?



Stephenson - Cross                                    79

1  A    Correct.

2  Q    And that was at their request, correct?

3  A    I believe so, yes.

4  Q    And the title had notated on it a $70,000 lien, correct?

5  A    Can you rephrase?

6         MR. GIBBS:  I think it was 75.

7  BY MR. MARTIN:

8  Q    $75,000?  Around $75 -- $70 to $75,000.  Is that correct?

9  A    I just want to say that the title that we have in the

10 exhibits say $75,000, yes.

11 Q    But the total amount of the loan fluctuated from time to

12 time, correct?

13 A    Correct.

14 Q    Okay.

15 A    So the original amount was different from that.

16 Q    Now, it was back in 2012 that you proposed to Mr. Mosing

17 the transaction at issue in this case, correct?

18 A    Yes.

19 Q    And you made that proposal to him after you had mailed the

20 title to Extraco Bank, correct?

21 A    Correct.

22 Q    And in that initial proposal to him, that April 2012

23 email, you did not tell Mr. Mosing that there was a lien on the

24 vehicle, correct?

25 A    I don't recall specifically telling him that, no.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Stephenson - Cross                          80

1   Q    Don't you think that would have been pertinent information

2   for Mr. Mosing to know?

3            MR. CONRARDY:  Objection.  Calls for speculation.

4            MR. MARTIN:  This is going to his experience in the

5   automobile industry and buying and selling replica vehicles.

6            THE COURT:  I'll allow the question.

7   BY MR. MARTIN:

8   Q    You can answer the question.

9   A    When you take a loan out from a bank, yes, absolutely.

10  Q    So he would have wanted to know that there was a lien on

11  the vehicle, correct?

12           MR. CONRARDY:  Objection again.  Well, what he wants

13  to know, he's already testified to, so it asks a duplicative.

14           THE COURT:  Overruled.

15           MR. MARTIN:  You can answer the question.

16           THE WITNESS:  Could you repeat, sir?

17  BY MR. MARTIN:

18  Q    He would have wanted to know that there was a $75,000 lien

19  on the vehicle, correct?

20  A    I don't know what his thoughts would have been at the time

21  the contract was --

22  Q    Well, in your experience as a professional in the

23  automobile industry, buyers generally want to know if there's a

24  lien on a vehicle they're buying, correct?

25  A    In this situation, we had a gentlemen's agreement on the

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Stephenson - Cross                          81

1   transaction.

2               MR. MARTIN:  Objection.  Nonresponsive.  It's a yes

3   or no question.

4               THE COURT:  Okay.  So let him finish his answer

5   first.

6               MR. MARTIN:  Okay.

7               THE WITNESS:  Could you repeat the question again one

8   more time.

9   BY MR. MARTIN:

10  Q    In your experience as an automobile professional, isn't it

11  true that buyers want to know whether there is a lien on a

12  vehicle?

13              MR. CONRARDY:  Objection.  Hearsay.

14              MR. MARTIN:  No, this is going to his experience as

15  an automobile professional and his experience.

16              THE COURT:  As an expert?

17              MR. MARTIN:  No, not as an expert, just in -- for --

18  in his transactions personally.

19              MR. CONRARDY:  He hasn't personally qualified as an

20  expert, but second, he's asking this hypothetical about these

21  imaginary buyers.  We don't know what buyers want, these --

22              THE COURT:  You can ask if it is important to him.

23  BY MR. MARTIN:

24  Q    Would it be important to you to know whether there was a

25  lien on a vehicle before you purchased it?

Stephenson - Cross                                  82

1  A    Yes.

2  Q    And yet, in this correspondence to Mr. Mosing, you did not

3  disclose the existence of this lien.

4  A    Correct.

5  Q    Did it just slip your mind?

6  A    No.

7  Q    And in this same correspondence to Mr. Mosing, you never

8  disclosed that there was a title to this vehicle, did you?

9  A    That's not correct.

10  Q    Oh, you disclosed there was a title.

11  A    That's not correct either.  I had stated that I don't

12  recall the specific conversation.

13  Q    Well, I'm talking about the email to Mr. Mosing in April.

14  You didn't disclose there was a title in that email, did you?

15  A    Correct, I did not.

16  Q    And the May agreement with Mr. Mosing also didn't disclose

17  the existence of a title, did it?

18  A    Could you repeat that one again?

19  Q    The May agreement at issue in this case did not disclose

20  the existence of a title, did it?

21  A    Correct.

22  Q    In fact, there are no correspondence that are admitted

23  into evidence in this case right now that -- written

24  correspondence, there's no written correspondence that

25  disclosed the existence of a title, does there?

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

Stephenson - Cross                                      83

1   A     To my knowledge, no.

2   Q     Now, you considered this transaction a sale with a right

3   to buy back, didn't you?

4   A     Initially, yes.

5   Q     What do you mean, initially?

6   A     That was my proposal initially, yes.

7   Q     And it was also your understanding when you filed this

8   bankruptcy case, isn't it?

9   A     Could you repeat that specifically?

10  Q     Didn't you put in your statement of financial affairs that

11  you sold this vehicle to Mr. Mosing?

12  A     I don't have that information in front of me.

13  Q     Well, let's pull that up so you can have your recollection

14  refreshed.  Do you recall filling out your statement of

15  financial affairs?

16  A     Yes.

17  Q     And you were represented by counsel when you were filling

18  that out, right?

19  A     Correct.

20  Q     And you signed those -- the statement of financial affairs

21  under penalty of perjury, didn't you?

22  A     Yes.

23  Q     And so what's in here is true, correct?

24  A     I haven't seen it yet, but to my knowledge --

25  Q     Okay.  Let's go to the relevant section.  Do you see,

Stephenson - Cross                              84

1   under Part 9, Question 23, where it says, "Describe the

2   property"?

3   A    Yes.

4   Q    It says, "1965 Shelby Mustang convertible.  Debtor sold

5   vehicle to Jeff Mosing."  Do you see that?

6   A    I do.

7   Q    And that's a true statement, correct?

8   A    Specifically, it says, '65 Shelby Mustang convertible, so

9   that's incorrect.  My attorney had described it that way.

10  Q    But you see where he said, "The debtor sold the vehicle to

11  Jeff Mosing", correct?

12  A    Yes, I do.

13  Q    And can you go to the signature page at the end of the

14  document?  Do you see your signature, your electronic

15  signature, there in Part 12, where it says, "Tracy Dean

16  Stephenson"?

17  A    I mean, I see text, but it doesn't look like a signature.

18  Q    Right.  It's an electronic signature.  Do you see that?

19  A    Okay.  I do see that area, yes.

20  Q    And did you give your attorney permission to sign this

21  document electronically?

22  A    Yes.

23  Q    And the date on this is June 5, 2019, correct?

24  A    Yes.

25  Q    So as of June 5, 2019, your position was that you sold the

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Stephenson - Redirect                          85

1   vehicle to Mr. Mosing.

2   A    Yes.

3   Q    Okay.  And that hasn't changed, has it?

4   A    No.

5   Q    Because it's your position, isn't it, that when you failed

6   to repurchase the Cobra, that ownership transferred to

7   Mr. Mosing, isn't it?

8   A    Yes.

9            MR. MARTIN:  No further questions.

10           THE COURT:  Mr. Conrardy, cross.  Or redirect.

11  Excuse me.

12           MR. CONRARDY:  I got just a few quick questions.

13                    REDIRECT EXAMINATION

14  BY MR. CONRARDY:

15  Q    Mr. Stephenson, why didn't you disclose the existence of

16  the title to Mr. Mosing?

17  A    It was my intent to pay it off.

18  Q    Okay.  Is that also why you didn't disclose the extra

19  co-lien?

20           THE COURT:  I'm sorry, I didn't hear you --

21  understand that.

22  BY MR. CONRARDY:

23  Q    Oh, is that also why you did not disclose the extra

24  co-lien?

25  A    I don't recall that I did not disclose.  We had

86

1  conversations.  We had a couple of email back and forths, but

2  we had conversations, and I don't recall specifically what was

3  discussed with Jeff regarding the title.

4  Q    These conversations were back in 2012, right?

5  A    Correct.

6  Q    And that's -- it's 2011 [sic], so almost nine years ago,

7  right?

8  A    Correct.

9  Q    So is it fair to say that maybe memories have faded or

10 changed since then?

11 A    Yes.

12         MR. CONRARDY:  Okay.  I have no further questions for

13 Mr. Stephenson.

14         MR. MARTIN:  No further questions, Your Honor.

15         THE COURT:  Thank you, sir.  You may step down.

16         THE WITNESS:  Thank you.

17     (Witness excused)

18         THE COURT:  Is Mr. Stephenson under subpoena?

19         MR. CONRARDY:  Yes, he is, so he may be released.

20         THE COURT:  All right.  And get down before they

21 ticket you on your car at the meter.

22         MR. MARTIN:  Thank you for your time, Mr. Stephenson.

23         MR. CONRARDY:  Thank you for your time.  Safe travels

24 back to Texas.

25         So I want to, maybe, address, maybe a way to kind of

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page87 of 122

87

1   expedite this because I know Mr. Martin would like to get home

2   today, if possible.  And so I think we only have a little bit

3   left, so I'd like to get his feedback.  The only witness left

4   is Mr. Peters, and his testimony is really just to focus on

5   547(d)(5), so Mr. Martin and I have discussed that he'll --

6           MR. MARTIN:  I'm fine stipulating that he complies

7   with the requirements of 547(d)(5).

8           MR. CONRARDY:  Oh, okay.  Then we don't really need

9   Mr. Peters'S testimony.

10          THE COURT:  Okay.

11          MR. CONRARDY:  Let me just double-check I'm citing

12  the right subsection.  I'd hate to make a mistake there.  I

13  think it is.  Yeah, (d)(5), so --

14          MR. MARTIN:  I'm fine stipulating.  I trust

15  Mr. Peters.

16          MR. CONRARDY:  Okay.  All right.  So with that,

17  there's no more evidence.

18          MR. MARTIN:  Correct.

19          MR. CONRARDY:  And so my suggestion would be, it's

20  almost lunchtime, either we kind of do closing arguments right

21  now, or another option would be we just do closing arguments by

22  Zoom and schedule a time so that Mr. Martin can catch a flight

23  today, but I'm open to whatever.

24          THE COURT:  When is your flight?

25          MR. MARTIN:  I'm fine completing it today.  I know

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page88 of 122

88

1  Mr. Mosing is anxious to get this behind him, so my flight's

2  not until six o'clock.

3          MR. CONRARDY:  Oh.

4          THE COURT:  Oh, you got plenty of time.

5          MR. MARTIN:  Yes, plenty of time.

6          THE COURT:  Traffic to DIA is a headache, but not

7  that bad.

8          MR. MARTIN:  Not that heavy.  No, it's not.  Okay.

9  So I'm fine with taking a short break, 15 minutes.

10          THE COURT:  All right.  So let's take a 10-minute

11  break and we'll come back and we'll do closings.

12          MR. MARTIN:  Okay.  Sounds good.

13          THE CLERK:  All rise.

14      (Recess taken at 11:59 a.m.)

15      (Proceedings resumed at 12:14 p.m.)

16          THE CLERK:  All rise.

17          THE COURT:  Please be seated.

18          All right, Mr. Conrardy.

19          MR. CONRARDY:  All right.  I'll bring my code book

20  just in case you have some of those questions or I need to look

21  at it.

22          THE COURT:  Why, you think I have a question you --

23          MR. CONRARDY:  You would never do that.  All right.

24  Okay.  So I think what this case really boils down to is --

25          THE COURT:  Would you take off your mask so I can --

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page89 of 122

89

1           MR. CONRARDY:  Oh, yes, I'm sorry.  I keep

2   forgetting.  So there are a couple different steps that we need

3   to go through.  The first is whether this was a purchase or a

4   loan and then the second is going to be this constructive trust

5   issue.

6           So I'm going to address the first issue first.  So

7   we've heard a lot of testimony, I think even the Debtor, Debtor

8   concedes that he thought this was a purchase agreement, he

9   always imagined it to be a purchase agreement, but I think all

10  of the documents that are signed by Jeff Mosing, he, who is the

11  person who loaned the money, has considered it to be a loan.

12          And so, you know, understandably, this agreement that

13  they entered into, the May 8th, 2012 agreement, you know, it

14  doesn't have a lot of specifics.  It's handwritten.  You know,

15  it doesn't have language for a security interest, it doesn't

16  have, really, any specific repayment terms, there's not a

17  default provision, et cetera.

18          But it can be looked at as a loan where $120,000 was

19  loaned and then with each increment, 130, 140, 150, that that

20  was interest.

21          And I think what really supports the fact that this

22  was a loan is, on the same day they entered into this

23  agreement, Mr. Mosing signed the $120,000 check, and he put in

24  the memo line, one year capital loan.

25          That's his own handwriting.  That's his own

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21 153 Entered:09/10/21 16:24:44    Page90 of 122

90

1    statement.  That's, at the time of this transaction, Mr. Mosing

2    considered it a loan.  And it's really hard to refute that.

3          And I think Mr. Mosing understands that there might

4    be some legal implications for characterizing it as a loan, and

5    so he's tried to, since the adversary proceeding, has been

6    filed to try to recharacterize it as something else.

7          And what's interesting is, so we've got this check in

8    2012 that says it's a loan, and we fast forward to June 5th,

9    2019, this is during the case, and we've got this letter that

10   was written by Kirk Winterrowd, and Mr. Mosing testified that

11   he helped draft the letter, he approved the signature, and it

12   has language in there that matches a loan.

13          It says, Jeff Mosing, an agreement with Jeff Mosing

14   to borrow the $120,000, not to sell the car to Trac for

15   $120,000, and then it says, and that Trac Stephenson put up as

16   collateral, the 1965 Shelby Cobra.

17          Those are words and terms that we're used to seeing

18   in the context of a loan, not a purchase.

19          THE COURT:  But you even kind of mentioned a pawn

20   agreement.

21          MR. CONRARDY:  Yes.

22          THE COURT:  And then say, I had to recognize these

23   that no one's doing in the pawn industry here.

24          MR. CONRARDY:  Yes.

25          THE COURT:  Well, this thing does smack a lot of

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page91 of 122

91

1  that.

2          MR. CONRARDY:  It sure does, Your Honor.  And you

3  brought that up during the oral arguments for motion for

4  summary judgement, and so I'm prepared to address that.

5          It does have a lot of elements of a pawn agreement,

6  right?  I mean, this is almost exactly how pawn agreements

7  work, right?

8          THE COURT:  Oh, it smacks a whole lot.  We've seen

9  enough of them around here.  We've gotten to know them pretty

10 well.

11         MR. CONRARDY:  Yes, you know, I've got a guitar and I

12 need money for rent, I take my guitar to the pawn shop, they

13 give me 80 bucks, and if I, you know, redeem it within 10 days,

14 I pay 90, et cetera.  It looks a lot like a pawn agreement.

15         And so there is some case law in Texas, and there's a

16 pawn statute, it's the Texas Pawn Shop Act, that talks about

17 what something needs to be to be a pawn agreement.

18         First of all, it needs to be on a pawn ticket.  Maybe

19 this is a pawn ticket, but it has to be issued by a licensed

20 pawnbroker.  Mr. Mosing testified he's not a licensed

21 pawnbroker.  There are also some other statutory requirements,

22 one is, it cannot exceed a 30-day maturity limit.  This has a

23 one-year maturity.

24         It also cannot exceed a loan of $18,240.  This is

25 $120,000.  So there are some other terms --

ACCESS TRANSCRIPTS, LLC          ⚖          1-855-USE-ACCESS (873-2223)

92

 1          THE COURT:  Well, I'm not saying this is a pawn

 2    agreement, I said it just smacks of one.

 3          MR. CONRARDY:  It sure does smack of a pawn

 4    agreement.

 5          THE COURT:  But the question is, can a pawn

 6    arrangement also be a sale arrangement.

 7          MR. CONRARDY:  So a pawn arrangement can be, this is

 8    where it gets tricky, can be a sale or a loan, right?  So there

 9    is some case law in Texas that talks about how it can everybody

10    either a sale or a loan.  This is kind of unclear, on its face,

11    whether it's a sale or a loan.

12          And I would submit to the Court that some of the

13    subsequent evidence and documents signed by Mr. Mosing clarify

14    that it's actually a loan.

15          So if it's a loan, then it certainly is avoidable

16    under 547 and I think we meet all the elements of 547.  The

17    debtor is presumed insolvent.  It's an antecedent debt.

18    They've conceded that 547(d)(5), I don't think there's any

19    dispute that we would meet the elements of it alone.

20          And if it's a purchase, here's kind of the other,

21    kind of, contour, which is, there is a Texas bankruptcy case,

22    I'm going to cite it, it's In re Prado, P-R-A-D-O, it's 340 BR

23    574 (Bankr. S.D. Tex. 2006).

24          And in that --

25          THE COURT:  574, I'm sorry?

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page93 of 122

93

1                MR. CONRARDY:  Oh, I'm sorry, 340 BR 574.

2                THE COURT:  574.  Okay.

3                MR. CONRARDY:  And the pincite, which I'm going to

4    cite to, is 583.  It's a 2006 Southern District of Texas case.

5    It's talking about -- it's applying Texas law, so it couldn't

6    be, really, anymore helpful, and what it says here is, if the

7    pawn shop doesn't comply with the statute, and one of the

8    things it has to do is note on the pawn ticket, so here's the

9    agreement, it has to note on the pawn ticket that the

10   collateral has been transferred or that the lien has been

11   enforced.

12               There are no notations and there are several other

13   requirements that they outline in the case, but the consequence

14   of that is, if the pawn agreement isn't properly enforced,

15   which, if this is a pawn agreement, it isn't, then it doesn't

16   mature.

17               And so it can be redeemed at any time, which means --

18               THE COURT:  But this isn't a pawn agreement.  That's

19   the problem.  This is, really, isn't, and for the reason which

20   you, yourself, stated in the argument.  It isn't.

21               MR. CONRARDY:  Yes.

22               THE COURT:  It kind of looks like one.  This is one

23   of those instances where, it walks like a duck, quacks like a

24   duck, but it really isn't a duck.

25               MR. CONRARDY:  Yes, it's like a mongoose or

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/20/21    Entered:09/10/21 16:24:44    Page94 of 122

94

1   something.

2          THE COURT:  But it has the same kind of aspects to

3   it.  The question I've got for you is, even if it has aspects

4   to it, can it still be a legitimate regular purchase?  And if

5   that's the case, what does that do to the Trustee's argument?

6          MR. CONRARDY:  Yes, so I don't think that it can be a

7   purchase because we're looking at all this other evidence, but

8   if the Court deems that it is a purchase, I don't think it

9   really changes the outcome because Mr. Mosing didn't take the

10  proper steps to perfect his ownership interest.

11         He doesn't have a title that says, I own this car,

12  right?  He has an MSO and there is a case that the Court cited

13  in the order for summary judgement that talks about the legal

14  effect of an MSO.  Let me get that for you right here, because

15  I think --

16         THE COURT:  Well, I remember that opinion very well.

17  I read it about four times this week.

18         MR. CONRARDY:  Yes, that's the APECO Corp v. Bishop.

19  Is that the one we're talking about?  So I'm going to, kind of,

20  cite to two things.  One is, there's this Tex. Jur. 3d

21  Automobiles at Section 203.

22         The Court cited to that in the motion for summary

23  judgement order, but it cited to one of the remarks.  It didn't

24  cite to the body of it.  and what that says is, a new motor

25  vehicle is a motor vehicle that has not been subject of a

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page95 of 122

95

1   retail sale, regardless of mileage of the vehicle.

2           If a new motor vehicle has never been registered in

3   Texas or elsewhere, it may be transferred any number of times

4   by a proper endorsement of the MSO.

5           So we have two problems here, is that, a certificate

6   of title was issued and it was not -- there was no endorsement

7   from Trac, or from Mr. Stephenson, to Mr. Mosing.  So the

8   transfer, if there was a transfer, there was a purchase, it's

9   void, because Mr. Mosing, while he's a sophisticated automobile

10  dealer, did not comply with the Texas statute.

11          And that the case that's noted in that AMJR, is this

12  <u>APECO Corp v. Bishop Mobile Homes</u>.  It's 506 SW.2d 711  (Tex.

13  App. 1974).

14          And it says here, and I'm going to just quote, it

15  says:

16          "The manufacturer's certificate properly filled out

17          is necessary only for the purposes of registering the

18          vehicle and obtaining the initial certificate of

19          title.  After the vehicle is registered for the first

20          time and the certificate of title is issued, title to

21          the vehicle is in evidence solely by the certificate

22          of title."

23          And so Texas, well, I think is pretty clear that if

24  the intent here was to purchase it, it's, the sale has failed,

25  because there's no endorsement on the back of the MSO.  And

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page96 of 122

96

1    even if there had been, a certificate of title had already

2    issued, so it's --

3          THE COURT:  If that was the case, there may be fraud

4    involved, which is, I think, the position of Mr. Mosing, is

5    this was, yes, he's the subject of fraud.

6          MR. CONRARDY:  I think that is Mr. Mosing's position,

7    that he is the subject of fraud, but I think there are some --

8    I don't know that he satisfies all of the elements for fraud,

9    because --

10          THE COURT:  Well, let's just, yes, again,

11   hypothetically --

12          MR. CONRARDY:  Okay, hypothetically.

13          THE COURT:  -- assuming he did, and this thing was,

14   and he was the victim of fraud, does that mean anything in

15   terms of ownership of the vehicle or does that just give him a

16   claim for non-dischargeability?

17          MR. CONRARDY:  Yes, so I think it gives him a claim,

18   under 523, for non-dischargeability, which they didn't file,

19   and I don't understand why they didn't, and it would also

20   potentially give him an unsecured claim in the case for the

21   unpaid loan and for whatever damages may arise out of the

22   fraud.

23          But the problem is, is, if there is a constructive

24   trust, it's an unrecorded interest, right?  It's not, other

25   creditors don't know about it.  And so under the Richards

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page97 of 122

97

1  opinion, whether it's a constructive trust for a lien or

2  whether it's for a purchase, it's still unrecorded interest in

3  property, and so the Trustee's hypothetical judgement liens are

4  going to trump that, because courts, and, you know, we cited a

5  Supreme Court opinion in the motion for summary judgement, I

6  can provide that again, are really reluctant to enforce or find

7  that a constructive trust existed because it totally disrupts

8  the underlying policy of bankruptcy, which is to collect claims

9  and assets and distribute them evenly to creditors.

10         What a constructive trust does is, take an asset and

11  give it to one creditor.  So they're very -- the case law is,

12  look, we're not going to do a constructive trust unless it's

13  just this egregious, extraordinary circumstance.

14         And here, you know, I don't see that there was

15  anything egregious, I think it was, I think that Mr. Mosing

16  just didn't do his due diligence.

17         He didn't ask for a title, he didn't do a title

18  search, he relied on the MSO, and it wasn't -- he didn't have

19  it endorsed.  He didn't get anything in writing, either an

20  email or a letter, from Trac, Mr. Stephenson, saying, yes, I

21  don't have a title.  The only thing that's even been issued is

22  an MSO, and there are no liens.

23         It was kind of like a -- he said, I think

24  Mr. Stephenson testified, he said, a gentlemen's deal, I get

25  that, but he should have really observed some of these

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page98 of 122

98

1  formalities, especially on a transaction that size, to protect

2  his interests.

3          And it's not really fair to the other creditors to

4  shift all of that blame.

5          THE COURT:  Okay.  Go on.

6          MR. CONRARDY:  Okay.  Right.  So I'll go back to

7  Mr. Mosing's testimony, it does seem self-serving, and it's

8  kind of after-the-fact, now he's trying to recharacterize this

9  as a sale.

10          I mean, I mentioned the check, we've got the June

11 5th, 2019 letter that he authorized, saying it was a loan,

12 we've got the DMV paperwork that was filed, you know, right

13 after that, or not filed, but prepared shortly after that

14 letter, where he says the car was given as a payment for a

15 loan.

16          And these are all signed by Mr. Mosing and so it's a

17 little disingenuous to recharacterize this as a purchase when

18 we have all of this evidence signed by Mr. Mosing it was a

19 loan.

20          So if it was a loan, and Mr. Mosing was defrauded,

21 that doesn't really change the fact that if there is a

22 constructive trust imposed, it's going to be a junior interest

23 to the Trustee's interests.

24          THE COURT:  What about other indicia of ownership?

25 The possession, he held possession of it.

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page99 of 122

99

1          MR. CONRARDY:  He did.

2          THE COURT:  He testified he paid insurance.

3          MR. CONRARDY:  He did.

4          THE COURT:  So all of that seems to be some kind of
5 indicia that he at least believed he was the owner, does it
6 not?

7          MR. CONRARDY:  Yes, I mean, I think he believed he's
8 the owner.  It's a little inconsistent, though, if he thought
9 he was the owner, but then he had a loan, so it's kind of
10 unclear, if you take his testimony and compare it to what stuff
11 he signed, it's unclear whether he even thought that he was
12 actually the owner.

13        And, you know, what he should have done is, he didn't
14 really take any affirmative action to evidence his ownership.
15 He never sent demand letters, he never sued Mr. Stephenson, he
16 didn't even apply for title until the bankruptcy case was
17 filed, which was seven years after the transaction.

18        So yes, having possession and paying insurance are
19 some indicias, but look at the big picture, he really sat on
20 his rights, which brings me to, let's see, another point here.

21        Also, I just want to bring up too, that, there has
22 been some argument that dealers can transfer title or transfer
23 vehicles with an MSO.  However, the Texas Title Act provides
24 that MSOs can only be transferred from dealer to dealer, right,
25 unless it's the very first transaction.

1         So if I'm a dealer, I sell a car, I give the MSO to

2    the buyer, they take that MSO to the DMV and get a title.

3    After that, the MSO means nothing, but if I'm a dealer, and I

4    sell my car to another dealer, I can give him the MSO, he can

5    sell it to another dealer, he can give him the MSO.

6         The issue here is, the parties to this transaction

7    aren't dealers, right?  They were individuals, so Jeff Mosing

8    was individually party to the transaction and Mr. Stephenson

9    was individually party, and Mr. Stephenson testified he was not

10   a dealer.

11        So the MSO, those kind of MSO transfer rules don't

12   apply here because it's not a dealer-to-dealer transaction.

13        Also, so on the constructive trust issue, so to

14   prevail on the constructive trust, you know, setting aside

15   whether that is avoidable itself, Mr. Mosing has to prove

16   fraud.

17        And the standard, both in Texas and Colorado, to

18   prove fraud is, it's a heightened clear and convincing evidence

19   standard.  It's a higher burden.  It's an additional burden,

20   right?

21        And so we've heard some evidence -- basically, we

22   have contradictory evidence here.  One person says, Mr. Mosing

23   says this was a sale, or a purchase, even though all the

24   documents he signed says it's a loan, and then Mr. Stephenson

25   says it was a purchase.

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page101 of 122

101

1    But even kind of going a level below that is, there

2   wasn't really any clear evidence regarding the title issue,

3   right?  There are no --

4    THE COURT:  Well, I don't know.  Let's talk about

5   that.

6    MR. CONRARDY:  Okay.  Yes, let's talk about that.

7    THE COURT:  Because what I heard was that

8   Mr. Stephenson had given the title up to the bank, he wanted

9   money, he thought he was going to be able to buy out the title

10  from the bank using a partial payment as opposed to a full

11  payment, which didn't work out.

12    MR. CONRARDY:  Yes, yes, that's all right.

13    THE COURT:  And that he, you know, talked to

14  Mr. Mosing --

15    MR. CONRARDY:  Yes.

16    THE COURT:  -- and while he said it was important to

17  him, it would have been important to him that there was no

18  title, he specifically didn't disclose that.

19    MR. CONRARDY:  Yes.

20    THE COURT:  So it smacks like he wanted money --

21    MR. CONRARDY:  Yes.

22    THE COURT:  -- and was willing to do anything he

23  could to get the money, even, possibly, deceiving Mr. Mosing.

24  That's a fairly good indicia of fraud, is it not?

25    MR. CONRARDY:  Looked at with just those facts, it

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page102 of 122

102

1  is, but if you kind of opened up the lens --

2          THE COURT:  Oh, I know, yes, Mr. Martin's going to

3  have to explain about opening the lens a little bit later on

4  when he gets up.

5          MR. CONRARDY:  Yes.

6          THE COURT:  I'm talking about right now.  We're

7  talking about fraud.  And if that's the fraud he's trying to

8  argue about, it is a relatively convincing argument.

9          MR. CONRARDY:  It is, and it isn't, because

10 Mr. Mosing was -- is a sophisticated motor vehicle dealer, and

11 has done a lot of transactions, and he said -- he testified

12 that, you know, if he would have known there was a lien, he

13 wouldn't have done it, well, he never asked, right?

14         Like, you got to do some due diligence.  I mean, that

15 maybe not excuse everything, but you've got to ask for, hey, do

16 you have a title or get something in writing saying, hey give

17 me the title.

18         On the back of the MSO, hey, endorse the back of the

19 MSO.  He didn't do that and that may have solved some of the

20 problems.

21         And he didn't do an independent search, he didn't do

22 a search of the Texas DMV, he didn't do a national search, he

23 didn't do a Colorado search.  These are all -- you know, when

24 somebody buys a house, they hire a title company to search for

25 liens.  That's due diligence.

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page103 of 122

103

1     No due diligence was done here, so it is kind of a

2 gray area.  It's, you know, when does someone's lack of due

3 diligence turn into someone else's fraud?

4     In there's also a statute of limitations issue here,

5 which we did plead as an affirmative defense.  So under the

6 Texas Civil Practice and Remedies Code, it's Section 16.004, it

7 says, "An action for fraud must be brought within four years of

8 the cause of action accruing."

9     Now, Texas does use the discovery rule, like we do

10 here in Colorado, however, it does have an exception.  Texas

11 does not apply the discovery rule to fraud claims when

12 reasonable diligence would have uncovered the fraud.

13     And the case for that is Seureau, S-E-U-R-E-A-U, v.

14 Exxon Mobile, 274 S.W.3d 206 (Tex. App. 2008).  Here, the final

15 payment was due on May 9th of 2013, so I think there's an

16 argument that the statute of limitations expired on May 10th of

17 2017, which is four years later, because again, I don't want to

18 sound like I'm beating a dead horse, Mr. Mosing's a

19 sophisticated guy, he should have done a title search, or why

20 didn't he apply for title, you know --

21     THE COURT:  Well, if they searched -- if they --

22     MR. CONRARDY:  -- four years ago?

23     THE COURT:  -- sue Mr. Stephenson, they can hire you

24 as an attorney to raise that as an affirmative defense for

25 them.

ACCESS TRANSCRIPTS, LLC        1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page104 of 122

104

1           MR. CONRARDY:  Yes, well, they may be getting a 523,

2   but I'm just saying, like, why -- it does raise some questions

3   of, why did Mr. Mosing wait until the bankruptcy case was filed

4   to get a title?

5           Why did he wait so long, wait six or seven years?

6   There was never really an explanation provided for that.  I

7   think, you know, kind of related to that, we also pled a

8   latches affirmative defense.

9           The elements of latches in Texas are unreasonable

10  delay and unreasonable delay for one having a legal or

11  equitable right in asserting them, and a good-faith change of

12  position by another to his detriment because of the delay.

13          So Mr. Mosing delayed for six years in applying for

14  title.  He really sat on his rights.  And as a consequence,

15  it's now causing a detriment to, or a potential detriment to,

16  the creditors of this bankruptcy estate.

17          If he would have just enforced his rights years ago,

18  we probably wouldn't even be here, but he has all of these,

19  kind of, unrecorded alleged interests in the vehicle.

20          If this was personal property, I think it would be

21  different, but it's a motor vehicle, it's kind of like real

22  property, where there are special titling representatives, and

23  none of them were complied with.

24          So, you know, I won't, kind of, rehash all the

25  arguments we made in the motion for summary judgement, but I

Case No. 1:22-cv-00642-GPG   Document 8-2   filed 04/14/22   USDC Colorado   pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21 Entered:09/10/21 16:24:44   Page105 of 122

105

1  will incorporate them in the closing, and I would just, I think

2  there's enough evidence here that I don't think they've

3  overcome their heightened standard for fraud, but even if they

4  did, the interest is a lien, which is avoidable, and if it's an

5  ownership interest, it was never perfected, so that, again, is

6  avoidable.

7         It's almost like someone sells a house and doesn't

8  record the quitclaim deed, the grantee isn't going to have an

9  interest that trumps a trustee if a bankruptcy case is filed,

10  and it's really no different.

11         And so we believe that the Trustee has satisfied all

12  the elements for his first and second claims for relief, we

13  request that an order enter avoiding the interest, preserving

14  them for the benefit of the estate, and entering an order to

15  turnover the Cobra, and I'll reserve for a response.

16         THE COURT:  Okay.  Thank you.

17         Come on up, Mr. Martin.

18         MR. MARTIN:  All right.  So obviously, I have a few

19  responses to what Mr. Conrardy already said, as well as --

20         THE COURT:  And I've got a few questions for you --

21         MR. MARTIN:  Oh, I'm sure.

22         THE COURT:  -- so go ahead.

23         MR. MARTIN:  Glad we're on the same page.  I'll kind

24  of address them in the same order that Mr. Conrardy already

25  did, both the ownership versus loan argument and then discuss

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page106 of 122

106

1  the fraud, constructive trust issue.

2          Interestingly, if there's one thing that

3  Mr. Stephenson and Mr. Mosing agreed on today, was that the

4  vehicle was sold.

5          You had testimony from Mr. Stephenson, under penalty

6  of perjury, as well as in his statement of financial affairs,

7  that he had sold the vehicle to Ms. Mosing back in 2013, but

8  then had that notation that the title remained in

9  Mr. Stephenson's name.

10         Then you have the testimony, under oath, today from

11 Mr. Mosing that he, too, believed the transaction to be a

12 purchase rather than a loan.

13         THE COURT:  Well, let me cut right to the chase.

14         MR. MARTIN:  Yes.

15         THE COURT:  If it was a purchase, why did Mr. Mosing

16 not do anything after 2013 to solidify ownership within his

17 name?  The MSO did not have an endorsement on the back.  There

18 doesn't seem to be any dispute with respect to that.

19         He, you know, obviously thought a few years later

20 that he needed to get a title, so they at least started

21 drafting documents to get a title issued by Texas, so even if

22 he didn't -- I'm not even talking about the title that was

23 issued in Colorado.

24         I will assume that he did not know about that, but he

25 could have taken -- and as soon as that thing matured, and a

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page107 of 122
107 of 153

107

1  payment wasn't made, he's clearly a savvy businessperson.

2          MR. MARTIN:  He is, and that's the reason why he

3  didn't title it, because as soon as he titles that vehicle, the

4  value goes down.

5          THE COURT:  But he couldn't do anything, he didn't

6  have the MSO assigned to him either.

7          MR. MARTIN:  Well, the actual back of the MSO isn't

8  in evidence.  You have the front of the MSO and you have Mr. --

9          THE COURT:  Well, but there's testimony on the fact

10 that there was nothing on the back.

11         MR. MARTIN:  Correct.

12         THE COURT:  And that's the only evidence I've got.

13 If you wanted to have the back of the MSO as evidence, you

14 could have done it.

15         MR. MARTIN:  Of course.

16         THE COURT:  So that's all I've got is the testimony

17 that it wasn't endorsed.

18         MR. MARTIN:  That's correct, Your Honor, and I would

19 just sit on the position that, in Mr. Mosing's mind, he owned

20 the vehicle, that is why he didn't take any actions to enforce

21 it against Mr. Stephenson, and that is why, in his mind,

22 titling it would have reduced the value of that vehicle.

23         THE COURT:  I understand the taxing implications of

24 that.  I understand that.

25         MR. MARTIN:  You know, obviously, if he had known

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page108 of 122
108 of 153

108

1 that the vehicle was already titled, and this kind of goes to

2 the fraud issue, if he had known that there was an outstanding

3 title, he would have taken action much sooner than 2019.

4          If he had known that there had been an outstanding

5 lien, he would have done more than just continuing to pay

6 storage costs, incurring, you know, maintenance expenses, and

7 paying insurance on the vehicle.

8          He would have been taken affirmative steps to enforce

9 his rights.  Mr. Conrardy already says that Mr. Mosing didn't

10 take the steps to enforce his rights.  That's because he didn't

11 know, because of Mr. Stephenson's fraud, that he needed to take

12 those steps.

13          If he had known that there was a title, if he had

14 known that there was a lien, you know, truthfully, the

15 agreement never takes place, but if he finds out afterwards,

16 during this gap period, you can bet that there would be

17 evidence that he would have done more than continue to accrue

18 expenses relating to a vehicle with disputed ownership.

19          THE COURT:  Okay.  Well, let me ask you another

20 question, which I hadn't understood, I need to do some research

21 after we're done here, a comment Mr. Conrardy made, which was,

22 MSOs need to be from dealer to dealer.

23          This was a transaction that was from a dealer to an

24 individual who ran a dealership, but it was to an individual.

25 Does that matter or is there -- again, I'm not familiar with

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page109 of 122

109

1    that portion of the statute.  I need to look at it.

2         MR. MARTIN:  Your Honor, I'm not familiar with it

3    either, and I'm not going to try and pretend that I am.

4         THE COURT:  So that's what I'm trying to figure out,

5    because if it was to an individual, then we've got another

6    layer of problems here.

7         MR. MARTIN:  And if the Court requests supplemental

8    briefing on that, I'm happy to prepare that for you.

9         THE COURT:  Oh, you're going to get it, so that's an

10   issue that, actually, when he mentioned it to me, my eyebrows

11   went up a little bit, because I'm --

12        MR. MARTIN:  Sure.  And that's the first I'm hearing

13   of it as well, so I'm happy to look into that and advise the

14   Court of Mr. Mosing's position that as well.

15        I can just say that, again, if that was the case, you

16   have an email from Mr. Stephenson that says, the MSO is all you

17   need.  And if there was some dealer-to-dealer exception,

18   Mr. Mosing was clearly unaware of that.

19        THE COURT:  Well, I'm not going to agree one way or

20   the other.  You know, Mr. Mosing, clearly, is sophisticated

21   enough to probably figure that one out, but go on.

22        MR. MARTIN:  So again, going back to the ownership

23   issue, I think you look at what the agreement itself says.  The

24   agreement that you say smacks of a pawn transaction.

25        THE COURT:  Yes, it resembles one.

110

1          MR. MARTIN:  Resembles one.

2          THE COURT:  It does smack of one, because it clearly

3    doesn't --

4          MR. MARTIN:  Because it doesn't really resemble --

5          THE COURT:  -- fit the details.

6          MR. MARTIN:  It doesn't really resemble a loan

7    either, because there's no term, there's no corresponding

8    promissory note, there's no security interest referenced,

9    because as you said, Mr. Mosing is a, you said, sophisticated

10   automobile industry person.

11         He presumably knows how loans work with automobile

12   vehicles.

13         THE COURT:  Well, that's why this case has baffled me

14   from day one.  We've got two people who know better and what

15   I've got in the way of documentation in this is something that

16   resembles two people who are not in the industry and just

17   cutting a deal amongst friends.  And it's --

18         MR. MARTIN:  And you'll notice that when this deal

19   was taking place, this was right when Mr. Mosing was

20   establishing himself in Texas.  This was, I believe, in 2012,

21   and Mr. Mosing testified that he had opened his dealership

22   right around that same time.

23         I'm not going to speculate from the podium, you know,

24   does that mean he's less sophisticated or not?  It's just

25   something that I would note.

ACCESS TRANSCRIPTS, LLC        ⚖        1-855-USE-ACCESS (873-2223)

111

 1          Additionally, or going back to the agreement, another
 2   indicia that this was a purchase and not a loan was the fact
 3   that Mr. Mosing took no actions from 2013 to 2019 to enforce
 4   his rights, because if he believed that he had a loan that he
 5   needed to enforce, you would see demand letters, you would see
 6   efforts to enforce those agreements.

 7          Instead, what you see are indicias of ownership.  You
 8   say the paying of insurance, you see the maintenance, you see
 9   the storage, and you don't see any communications, either from
10   Mr. Stephenson to Mr. Mosing, saying, hey, I want my vehicle
11   back, or, hey, what are you doing with this car, or vice versa
12   from Mr. Mosing to Mr. Stephenson.

13          What you instead see if two parties that are acting
14   like this transaction is done and dusted.  That's what you're
15   seeing via this course of dealing.

16          And then -- well, I'll bring that up and take a note.
17   So, Your Honor, I think the evidence indicates that this could
18   be characterized as a purchase with a buyback option.  That's
19   how I read the agreement.

20          Could it have been more clear?  Yes.  Is it vague?
21   Yes.  But what you have is an agreement --

22          THE COURT:  Is it sloppy?  Yes.

23          MR. MARTIN:  Yes.  Yes, I wish Mr. Mosing had called
24   me back then and I would have drafted a different agreement,
25   but that didn't happen.

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21 of 153 Entered:09/10/21 16:24:44    Page112 of 122

112

1      You had two non-attorneys entering into an agreement

2   that was poorly papered, but the parties' course of dealings

3   after that agreement was entered indicate that it was

4   ownership.

5         Now, I understand Mr. Conrardy says, well, he wrote

6   down loan on the notation on the check, or in the various

7   documents afterwards, but Mr. Mosing testified that that was

8   more for his internal reference purpose and there were certain

9   tax implications to him to where he would want to turn those

10  documents over to the IRS if it --

11        THE COURT:  The problem we've got here, and this is

12  the problem that I'm battling with, if this were an action

13  against you versus Mr. Stephenson, we'd have a whole different

14  set of concerns.  I think that one would be relatively easy to

15  figure out.

16        We have got a bankruptcy case here --

17        MR. MARTIN:  Correct.

18        THE COURT:  -- which puts a whole --

19        MR. MARTIN:  Complicated things immensely.

20        THE COURT:  -- different veneer on this, and the

21  Trustee's role in representing the creditors is a different

22  veneer.  That's why you have 547, that's why you have 544, but

23  you have those superpowers, if you will, the trustees have.

24        So what could be an easy case between two

25  individuals --

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page113 of 122

113

1           MR. MARTIN:  Becomes a complicated case --

2           THE COURT:  -- becomes a whole lot more complicated.

3           MR. MARTIN:  -- in an adversarial proceeding.

4           THE COURT:  And that's why the argument you're making

5    right now would be an incredibly attractive one in a state

6    court --

7           MR. MARTIN:  Right.

8           THE COURT:  -- would be an easy one to deal with.

9    How do I deal with the fact that we know have the Trustee

10   involved, who has those superpowers?

11          MR. MARTIN:  Well, I think the constructive trust

12   argument becomes persuasive in that scenario.  And there is

13   case law in the Southern District of Texas, In re Cain

14   (phonetic), by Judge Marvin Isgur, that states that a

15   constructive trust is not subject to the Trustee's avoidance

16   action powers.

17          A constructive trust, under Texas law, and I believe

18   that there's an analogous Colorado provision, is to prevent

19   unjust enrichment.  And it acts as equitable ownership of the

20   identifiable res, and here you have a specific asset relating

21   to Mr. Stephenson's fraud.

22          When you look at a constructive trust, the three

23   elements are actual fraud, or breach of a special trust or

24   fiduciary relationship, unjust enrichment of the wrongdoer --

25          THE COURT:  Okay.  But is the estate the wrongdoer?

114

1          MR. MARTIN:  No, but the estate steps into the shoes

2    of the debtor in this scenario, and I believe his -- so

3    essentially, the debtor is benefitting from this double

4    payment, and by way of the debtor, the estate, because

5    Mr. Mosing already paid $120,000 for this vehicle, and now

6    because of the fraud, he's going to lose the vehicle.

7          THE COURT:  How is the debtor benefitting?  He is

8    going to get his discharge regardless of whether this comes

9    into the estate or not.

10          MR. MARTIN:  The debtor's estate benefits.

11          THE COURT:  Okay.  Well, that's different.  The

12   estate is a different animal.  That's where we're starting to

13   talk about --

14          MR. MARTIN:  Right.

15          THE COURT:  -- the complication bankruptcy involves

16   here.  Like I said, if it is unjust enrichment to the debtor,

17   clearly, we've got an estate here.  So the debtor is getting no

18   benefit one way or the other on this, because he's getting his

19   discharge.

20          MR. MARTIN:  Correct.

21          THE COURT:  So whether he wins or loses, it doesn't

22   make a bit of difference to him.  He gleefully skips into,

23   there's no 523 action brought here --

24          MR. MARTIN:  Correct.

25          THE COURT:  -- he just goes merrily along with his

115

1   discharge.  So now you've got a trustee, the trustee is not the

2   debtor.

3            MR. MARTIN:  Correct.

4            THE COURT:  So how is the unjust enrichment argument,

5   how do you stick the trustee with the unjust enrichment?

6            MR. MARTIN:  Because I believe the trustee steps into

7   the shoes of the debtor in this scenario and steps into all the

8   rights and defenses that the debtor had as of the time of

9   filing, and one of those is this constructive trust claim.

10           THE COURT:  Okay.

11           MR. MARTIN:  And, again, I'm sure you're going to ask

12  for additional briefing on this issue, but --

13           THE COURT:  Oh, no, the constructive trust thing, I'm

14  fairly comfortable with.

15           MR. MARTIN:  Okay.

16           THE COURT:  And I know judges very well, I know the

17  opinions, so it's --

18           MR. MARTIN:  Yes, and so, you know, going to that

19  fraud, I think the evidence is very clear that there was a

20  motive for Mr. Stephenson to defraud Ms. Mosing.  It allowed

21  him to use the same asset to get, you know, twice the money,

22  essentially.

23           He was able to use it as collateral with Extraco Bank

24  to protect himself on these various real estate investments,

25  and then turnaround and use the MSO and tell Mr. Mosing that

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER    Doc#:94    Filed:09/10/21    Entered:09/10/21 16:24:44    Page116 of 122

116

1    there's no title on the MSO.

2           You have Mr. Mosing's testimony saying there's no
3    title, that he was advised by Mr. Stephenson that there was no
4    title, to then enter into this agreement that, you have
5    Mr. Mosing stating he would never have entered into if all the
6    facts had been disclosed to him.

7           And, you know, going back to Mr. Conrardy's argument,
8    well, you know, why didn't he do more due diligence.  You have
9    this course of dealing leading up to this transaction, where
10   you have four different sales going on where some of them have
11   just an MSO and some of them have a title.

12          And those transactions went through without a hitch,
13   and so that trust had been built up between Mr. Mosing and
14   Mr. Stephenson where there wasn't -- there was a trust that
15   the -- when he says, all you need is the MSO, Mr. Mosing took
16   him at his word, because there were other instances where all
17   he had was the MSO and it worked.

18          THE COURT:  Does that just make him an innocent dupe?

19          MR. MARTIN:  I wouldn't say he's an innocent dupe,
20   I'd say it's a course of dealing between two parties.

21          THE COURT:  Okay.

22          MR. MARTIN:  And this transaction took place in Texas
23   and, you know, Ms. Mosing did not --

24          THE COURT:  Yes, things are done differently in
25   Texas.  I understand that, but this, yes, I understand how this

117

1   happened, and like I said, I'm not casting aspersions to
2   anyone.  It's just, I am, you know, I'm puzzled that -- the way
3   this came down, the way it was documented, and now I'm trying
4   to figure out with the veneer of bankruptcy floating around in
5   here.
6           MR. MARTIN:  And you're having to reconstitute it,
7   you know, almost a decade later, which adds to the
8   complication.  This isn't a four-year lookback, this is the IRS
9   special ten-year lookback.
10          THE COURT:  Yes, I've got a pretty good hunch how
11  this whole deal came down, I'm just not sure now with those
12  facts, legally, how this comes out.  I truly haven't made my
13  mind up on this one.  I am going back and forth, because this
14  thing does trouble me.
15          MR. MARTIN:  It's a troubling case, Your Honor, and a
16  disappointing, I think, result for Mr. Mosing in that he's
17  been -- you have one of those situations that happens in
18  bankruptcy where you have a victim as a defendant.
19          THE COURT:  Oh, I'd be furious if I were Mr. Mosing.
20  I have no doubt I would be absolutely furious.
21          MR. MARTIN:  And Mr. Mosing is furious, but, you
22  know, he believes in this case and believes that, you know, he
23  was defrauded.  And that's the end of it.
24          THE COURT:  Oh, I understand the feeling.  The
25  question is --

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

118

1          MR. MARTIN:  What's the legal consequence of that.

2          THE COURT:  -- what's the legal consequences of all

3    the facts that have come down?

4          MR. MARTIN:  And Mr. Mosing's position, and I echo

5    it, is that, that constitutes a constructive trust that is

6    unavoidable by the trustee.

7          THE COURT:  Okay.

8          MR. MARTIN:  And it's to prevent unjust enrichment of

9    the estate.

10         THE COURT:  Okay.

11         MR. MARTIN:  Thank you.

12         THE COURT:  Okay.  Thank you.

13         Mr. Conrardy?

14         MR. CONRARDY:  Few quick remarks.  So on the unjust

15   enrichment argument, I don't see any conceivable situation here

16   where the debtor would be unjustly enriched if the trustee were

17   to prevail.

18         And Mr. Martin says that the trustee steps into the

19   shoes of the debtor, but our claim under 544 is specifically

20   predicated on the rights of creditors.  They're hypothetical

21   creditor rights.

22         And then our claim under 547, that's a creature of

23   bankruptcy law, only a trustee can have those, so I don't see

24   where the debtor is going to be unjustly enriched in any way

25   here if the trustee prevails.

119

1          Also, the, kind of, innocent victim, I totally get

2    that.  Mr. Mosing seems like a good guy, but we see this all

3    the time in bankruptcy under 547, where whether it's a vendor

4    or whatever, receives property within the 90 days, or we see,

5    the Court probably sees this a lot, there are trustee cases

6    where someone purchases a car, the lender doesn't perfect their

7    lien within the 30 days, and the trustee comes in and avoids

8    it.

9          And, I mean, that's really situation we're stuck with

10   here, is that, we need to bring this property back into the

11   estate and redistribute the assets evenly to all of the

12   creditors, and that's what the trustee is trying to do.

13         And I don't have any other remarks, but I do want to

14   thank the Court for its time this afternoon.

15         THE COURT:  Yes, Mr. Martin?

16         MR. MARTIN:  Yes, just a few last things, and just

17   out of an abundance of caution, in the event that the Court

18   does rule against Mr. Mosing, we do want to preserve any rights

19   we have under 502(h), as well as preserving any rights we have

20   to file an application for administrative expense for any costs

21   incurred in maintaining, and preserving, and storing the

22   vehicle between now and any judgement occurring.

23         THE COURT:  I understand.

24         MR. MARTIN:  Thank you.

25         THE COURT:  I'm a long way from deciding this one.

120

1   This is going to be -- I'm going to be beating my head on this

2   one.

3         I do want some supplemental briefing that are that

4   item which Mr. Conrardy mentioned, which I mentioned to you as

5   well, Mr. Martin, about the whole MOS statute -- or MSO

6   statute, excuse me, about, does it have to be between dealers

7   and dealers?

8         What about the endorsement?  Is it required, is it

9   not required?  I just need to -- it's, I just need some

10  information about that.  And just give me the statute, give me

11  what case law has interpreted, I will work on that.

12        I'll ask the parties to give me that in a couple

13  weeks.  Is that sufficient?

14        MR. GIBBS:  Yes, Your Honor.

15        MR. CONRARDY:  That's fine, Your Honor.

16        THE COURT:  I'm looking to you, Mr. Gibbs.  I have a

17  hunch this is coming your way, I have no doubt.  So I don't

18  want to screw up too many of your weekends.  All right.

19        That being the case, that's what I really am

20  interested in, and we're going to be doing some research

21  ourself on a couple other issues that I've highlighted for

22  myself.

23        MR. CONRARDY:  So it's being taken under advisement.

24        THE COURT:  I'm sorry?

25        MR. CONRARDY:  It's being taken under advisement, is

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

Case No. 1:22-cv-00642-GPG    Document 8-2    filed 04/14/22    USDC Colorado    pg
Case:19-01211-MER   Doc#:94   Filed:09/10/21   Entered:09/10/21 16:24:44   Page121 of 122

121

1  what you're saying.

2          THE COURT:  I'm taking it under advisement.

3  Absolutely.  Yes.  And, Mr. Conrardy, you see, I take

4  everything under advisement, so I'm uncomfortable doing oral

5  rulings, particularly something when it's close like this.

6          So that being the case, again, thank you very much.

7  Gentlemen, thanks for coming in from Colorado.

8          MR. GIBBS:  Thank you, Your Honor.

9          THE COURT:  Have a safe flight back.

10          MR. MARTIN:  Thank you.  I think this is my -- my

11  last trial in front of you was the house squatters back in 2012

12  and 2013.

13          THE COURT:  I thought you looked familiar.

14          MR. MARTIN:  Yes, but when I was with the U.S.

15  Trustee's Office doing all those house squatters and those.

16          THE COURT:  Okay.  That rings bells.  I said two

17  weeks, whatever two weeks from today is.  Let's make it two

18  weeks from Monday, that way I can screw up another weekend for

19  Mr. Gibbs.

20          MR. GIBBS:  Thank you, Your Honor.

21          THE COURT:  Okay, folks.

22          MR. CONRARDY:  Right.  Thank you.

23          THE COURT:  Thank you very, very much.

24      (Proceedings concluded at 12:58 p.m.)

25                        * * * * *

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)

122

1                              **C E R T I F I C A T I O N**

2

3              I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter, and to the best of my ability.

7

8

9

10

11   ALICIA JARRETT, AAERT NO. 428     DATE:  September 10, 2021

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)